Original
No. 2002-210

REPRESENTATIVE PETER BURLING & a.

v.

GENE CHANDLER, SPEAKER OF THE HOUSE & a.

Argued: June 11, 2002
Opinion Issued: July 26, 2002

*Hatem & Donovan, P.C.*, of Salem (*Michael D. Hatem* and *Bonnie J. Boulanger* on the memorandum, and *Mr. Hatem* orally), for the petitioners.

*Hinckley, Allen & Snyder, LLP*, of Concord (*Michael J. Connolly* and *Christopher H.M. Carter* on the memorandum, and *Mr. Carter* orally) for the Speaker of the New Hampshire House of Representatives.

*Betsy B. Miller*, house legal counsel, by memorandum and orally, for the New Hampshire House of Representatives.

*John M. Pratt & a.*, by memorandum, and *Mr. Pratt* orally, *pro se*, as *amici curiae*.

*Barry J. Glennon*, staff attorney, of Concord, filed no memorandum, for the Secretary of State.

PER CURIAM. Daniel Webster once said, "[T]he right to choose a representative is every man's portion of sovereign power." *Luther v. Borden*, 48 U.S. (7 How.) 1, 30 (1849) (statement of counsel).

For the first time in the history of this State, the supreme court is required to scrutinize the process of apportioning the people's right to vote in the election of representatives. That scrutiny has revealed significant anomalies, perpetuated for many years in the legislative redistricting process, which have undermined the principles of equality upon which the New Hampshire House of Representatives was founded. *See* N.H. CONST. pt. II, art. 9. Rather than protecting the people's constitutional right to "one person/one vote," a system has evolved that falls far short of that ideal. We hold, therefore, that the current method of creating districts fails to insure that "every voter is equal to every other voter" in this State. *Gray v. Sanders*, 372 U.S. 368, 380 (1963).

[1] This court has been drawn reluctantly into what is primarily a legislative task. "It is not our function to decide the peculiarly political questions involved in reapportionment, but it is our duty to insure the electorate equal protection of the laws." *Silver v. Brown*, 405 P.2d 132, 140 (Cal. 1965). Therefore, when the legislature has failed to act, it is the judiciary's duty to devise a constitutionally valid reapportionment plan. *See Scott v. Germano*, 381 U.S. 407, 409 (1965) (*per curiam*).

In furtherance of that duty, we establish a plan for new house districts. Accordingly, RSA 662:5 (1996) is no longer applicable. This plan corrects

the constitutional deficiencies in the existing districts and eliminates the present inequities. We are primarily governed by the constitutional requirement of "one person/one vote." In addition, in this case, we are able to adhere to other New Hampshire constitutional requirements and traditional State redistricting policies. We are indifferent to political considerations, such as incumbency or party affiliation. The plan we establish restores as nearly equal weight as possible to the votes of the people of New Hampshire. We do this by eliminating floterials and creating as many single-member districts as possible, with as few multi-member districts as necessary.

*I. Background and Procedural History*

█ The New Hampshire Constitution requires the legislature to redraw each representative district "as equal as circumstances will admit" every ten years, based upon the decennial census. N.H. CONST. pt. II, art. 9; *see* N.H. CONST. pt. II, art. 11. In anticipation of the results of the 2000 census, the house began the reapportionment process in January 2001 with the introduction of House Bill (HB) 420.

According to the 2000 census, between 1990 and 2000, New Hampshire's population grew more than 10%, increasing from 1,109,252 citizens in 1990 to 1,235,786 citizens in 2000. This growth was unevenly distributed between the northern and southern portions of the State, however, with the largest population growth occurring in the south. As a result, it is undisputed that following the 2000 census, the existing representative districts, established in 1992 pursuant to the 1990 census, violate both the State and Federal Constitutions. *See* N.H. CONST. pt. I, art. 11; N.H. CONST. pt. II, art. 9; U.S. CONST. amend. XIV; RSA 662:5.

In the winter of 2002, after a series of public hearings on proposed reapportionment plans, HB 420, containing a new apportionment plan for the house, was passed by both the house and the senate along party lines. The Governor vetoed the bill, however, on April 3, 2002. The house considered the Governor's veto on May 22, 2002, but was unable to achieve the two-thirds vote necessary to override it. As a result, HB 420 did not become law. *See* N.H. CONST. pt. II, art. 44.

In April 2002, the eleven petitioners, all incumbents, filed a petition for original jurisdiction requesting the court to declare the existing representative districts unconstitutional and to impose a deadline for the legislature to enact a valid reapportionment plan for the house. Given the imperative to establish a redistricting plan consistent with constitutional requisites before the 2002 elections, the court accepted jurisdiction. *See Monier v. Gallen*, 122 N.H. 474, 476 (1982).

Because the senate and house recessed on May 22, 2002, without enacting a house reapportionment plan, the court determined that it must establish a constitutional reapportionment plan for the house before a 2002 election could be held. *See Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *Connor v. Finch*, 431 U.S. 407, 415 (1977).

The court has endeavored to reapportion the house as fairly, as efficiently and as quickly as possible. It ordered the parties to submit constitutional reapportionment proposals by June 6, 2002. The court further required that any proposal submitted be based upon the 2000 census data and comply with the constitutional principle of one person/one vote. Oral argument was held on June 11, 2002. It was not until July 16, 2002, that the parties finally provided the court with all necessary information. This decision follows ten days later.

The court informed the parties of its intent to appoint Bobby Bowers, Director of the South Carolina Budget and Control Board Office of Research and Statistics, as its technical advisor in this case because it is an "extraordinary [one] where the introduction of outside skills and expertise, not possessed by the judge, will hasten the just adjudication of a dispute without dislodging the delicate balance of the juristic role." *Reilly v. United States*, 863 F.2d 149, 156 (1st Cir. 1988). Without objection, the court appointed him pursuant to its inherent authority. *See id. See generally State v. Coon*, 974 P.2d 386, 395-96 (Alaska 1999) (discussing authority of courts to appoint expert technical advisors). Bowers was appointed to serve the same role in this case as he was appointed to serve in *Below v. Secretary of State*, 148 N.H. 1 (2002).

We have reviewed, in detail, each plan filed in accordance with court deadlines and have also considered the written and oral submissions of the parties.

## II. Governing Principles

The New Hampshire Constitution is the supreme law of this State. *See Merrill v. Sherburne*, 1 N.H. 199, 217 (1818). The oath we took to honor that constitution makes it our duty to apply the State Constitution when it does not conflict with the United States Constitution. *See State v. LaFrance*, 124 N.H. 171, 177 (1983).

### A. One Person/One Vote

#### 1. History of Part II, Articles 9 and 11

We begin with a discussion of the one person/one vote standard under our own constitution. The New Hampshire Constitution guarantees that each citizen's vote will have equal weight. N.H. CONST. pt. I, art. 11.

With respect to the house of representatives, this right is assured by Part II, Articles 9 and 11 of the State Constitution.

Part II, Article 9, as amended in 1964, requires that the house of representatives be "founded on principles of equality" and that representation in the house of representatives "be as equal as circumstances will admit." N.H. CONST. pt. II, art. 9. Part II, Article 11, as amended in 1964, states, in pertinent part:

> When any town, ward, or unincorporated place, according to the last federal decennial census, has less than the number of inhabitants necessary to entitle it to one representative, the legislature shall form those towns, wards, or unincorporated places into representative districts which contain a sufficient number of inhabitants to entitle each district so formed to one or more representatives for the entire district. In forming the districts, the boundaries of towns, wards and unincorporated places shall be preserved and the towns, wards and unincorporated places forming one district shall be reasonably proximate to one another.

N.H. CONST. pt. II, art. 11.

Both articles were last amended as a result of the Constitutional Convention in 1964. *See* JOURNAL OF CONSTITUTIONAL CONVENTION 334, 358 (1964). Before 1964, Part II, Article 9 required the legislature to reapportion the house of representatives every ten years, following the taking of the national census. *See Levitt v. Stark*, 233 F. Supp. 566, 567 (D.N.H. 1964). It further provided:

> The number of inhabitants necessary to entitle any town or ward to representatives additional to the first shall be for each additional representative twice the number of inhabitants required for the first representative, so that the mean increasing number for every additional representative shall be twice the number required for the first or one representative.

*Id.* (quotation omitted).

Before 1964, Part II, Article 11 required the legislature to provide representation for towns or wards having fewer than the number of inhabitants to entitle them to a representative "in at least one session in every ten years." *Id.* at 567-68 (quotation omitted). These towns or wards elected a representative "such proportionate part of the time as the number of its inhabitants shall bear to the requisite number established for one representative." *Id.* at 568 (quotation omitted).

In 1961, the legislature set the number of inhabitants entitling a town to one representative at 822. *Id.*; *see* Laws 1961, ch. 275. It also established the election years in the decade to follow in which towns having fewer than 822 people were to elect a representative. *Levitt*, 233 F. Supp. at 568; *see* Laws 1961, ch. 275. Under the 1961 law, the smallest of these towns elected a representative to only one out of the five legislatures to be called in the decade, and the largest of these towns elected a representative to four out of the five legislatures to be called in the decade. *Levitt*, 233 F. Supp. at 568. Inhabitants of unincorporated places had no representation. *Id.* Thus, before 1964, representation in the house was essentially based upon a principle of one *town*/one vote, not one *person*/one vote.

At the 1964 Constitutional Convention, resolutions were introduced to amend both Part II, Article 9 and Part II, Article 11 to comply with recent United States Supreme Court decisions. The Governor supported amending Part II, Article 9 because he was "convinced that our present requirement that a town or ward have twice as much population for each additional representative as it needs for the first, would be declared unconstitutional." JOURNAL OF CONSTITUTIONAL CONVENTION, *supra* at 48. He urged delegates to amend Part II, Article 11 so as to "provide a system of full-time representation in the House of every citizen in New Hampshire" and, thus, "forestall action by the courts." *Id.* The Governor warned that if the convention failed to amend these articles, "precedents in other states show that the courts will take action in your place." *Id.*

Approximately one week after the convention began, the United States District Court for the District of New Hampshire issued its opinion in *Levitt*. In *Levitt*, the federal court stated that it "entertain[ed] serious doubt of the federal constitutional validity of the New Hampshire method for selecting the members of the legislature." *Levitt*, 233 F. Supp. at 569. The court noted, however, that the United States Supreme Court had not yet held that *both* houses of a bicameral state legislature had to be apportioned on the basis of population, and intimated that if only one of the houses of the New Hampshire Legislature were apportioned on the basis of population, the other house might survive federal court scrutiny. *Id.*

Before adjourning on June 10, 1964, the convention successfully passed a resolution to amend Part II, Article 11. The resolution to amend Part II, Article 11 "was intended to grant to the General Court the power to create districts where there are towns, wards and unincorporated places which are too small to be entitled to one full-time representative." JOURNAL OF CONSTITUTIONAL CONVENTION, *supra* at 231. As one delegate noted, "At the present time, such towns, wards and places send representatives on a part-time basis only" and the delegates "have been warned in [*Levitt*] that

this provision for part-time representation is probably unconstitutional." *Id.*

The amendment was also intended to give the legislature "a large measure of flexibility in forming districts." *Id.* Thus, the legislature was not confined to drawing single-member districts, but was authorized to form districts that were represented by "one or more representatives." *Id.*; *see Opinion of the Justices*, 111 N.H. 146, 150-51 (1971). Nor was the legislature required to form these multi-member districts *only* from the towns, wards and places that formerly had only part-time representation. The reference to "those towns, wards or unincorporated places" was not intended to limit the legislature's discretion as to how to form multi-member districts. JOURNAL OF CONSTITUTIONAL CONVENTION, *supra* at 231. As one delegate observed, "[W]e cannot here draw up a districting. That is a matter which will have to be taken up with the Legislature." *Id.* at 220.

The requirement that the towns, wards and places within a district be "reasonably proximate" to one another was also intended to give the legislature flexibility in drawing house districts. The convention delegates "felt that the Legislature should join towns and places which are close together wherever possible, but that there might be some instances where it would be just that two or more towns in the same county be put into a district though not adjacent or very close to each other." *Id.* at 231. The amendment the delegates passed, however, did not require the legislature to maintain county boundaries. *Id.*

The convention was unable to pass a resolution to amend Part II, Article 9 before adjourning on June 10, 1964. *See id.* at 399-402 (history of resolution nos. 4, 19 and 29); *Levitt v. Maynard*, 105 N.H. 447, 450-51 (1964). The convention reconvened on July 8, 1964, however, following the United States Supreme Court decision in *Reynolds*. In *Reynolds*, 377 U.S. at 576, the Court held, for the first time, that the Equal Protection Clause of the Federal Constitution requires *both* houses of a bicameral state legislature to be apportioned on the basis of population. *See Levitt*, 105 N.H. at 450-51. When it reconvened, the convention resolved to amend Part II, Article 9 to state that the house of representatives was "founded on principles of equality" and to require that representation in the house be "as equal as circumstances will admit." JOURNAL OF CONSTITUTIONAL CONVENTION, *supra* at 351-53, 355, 358; N.H. CONST. pt. II, art. 9.

In light of the history of the 1964 amendments to Part II, Articles 9 and 11, we hold that these provisions are at least as protective of a citizen's right to vote as the federal constitutional standard of one person/one vote. Accordingly, we need not undertake a separate federal analysis and we base this decision upon our State Constitution. *See State v. Ball*, 124 N.H.

226, 233 (1983). We rely upon federal cases interpreting the Federal Constitution only to aid in our analysis. *See id.*

### 2. Substantive Requirement of One Person/One Vote

"[T]he overriding objective [of apportionment] must be substantial equality of population among the various [legislative] districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Reynolds*, 377 U.S. at 579. Although "absolute population equality" need not be achieved, *Karcher v. Daggett*, 462 U.S. 725, 732-33 (1983), a court devising a remedial apportionment plan for a state legislature "must ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Chapman v. Meier*, 420 U.S. 1, 26-27 (1975). "[A]ny deviation from approximate population equality must be supported by enunciation of historically significant state policy or unique features." *Id.* at 26. In devising a court-ordered remedial apportionment plan, we must also act "circumspectly, and in a manner free from any taint of arbitrariness or discrimination." *Connor*, 431 U.S. at 415 (quotation omitted).

### a. Single- and Multi-Member Districts

To achieve "substantial equality" in an apportionment plan, States generally use two types of districts: single-member districts consisting of one representative elected by the district's voters, and multi-member districts from which more than one representative are elected. *See Burns v. Richardson*, 384 U.S. 73, 88 (1966); *see also* G. Moncrief & R. Joula, *When the Courts Don't Compute: Mathematics and Floterial Districts in Legislative Reapportionment Cases*, 4 J.L. & POL. 737, 741 (1988).

Single-member districts are preferred. *See Connor*, 431 U.S. at 415; *Chapman*, 420 U.S. at 19. Use of multi-member districts is constitutionally permissible, however, unless the districts are designed to or would "minimize or cancel out the voting strength of racial or political elements of the voting population," *Fortson v. Dorsey*, 379 U.S. 433, 439 (1965); *see Opinion of the Justices*, 111 N.H. at 150-51, or their use "produces deviations from substantial equality beyond the range of constitutional tolerance," *Opinion of the Justices*, 307 A.2d 198, 209 (Me. 1973) (quotation omitted).

### b. Floterials

A third method of representation used in a very few States, including New Hampshire within the last few decades, is a "floterial." *See* G. Moncrief & R. Joula, *supra* at 742. A floterial has been described as a district that "floats above" several distinct districts. *See id.* at 738

(quotation omitted). Floterials, as constructed in New Hampshire, have led to unusual results and voting right inequities.

For example, in Carroll County, the 1992 house reapportionment plan included three floterials: Districts 3, 8 and 10. A map of the 1992 plan for Carroll County is attached to this opinion as Appendix A. Each floterial consisted of some locations that were part of the floterial only and other locations that were part of either a single-member or multi-member district, in addition to the floterial.

Carroll County District 10 was a floterial with two representatives covering four towns, Moultonborough, Sandwich, Tamworth and Tuftonboro, with a total population of 8,029, according to the 1990 census. Moultonborough was also a single-member district with one representative for the town's total population of 2,956. Thus, voters in Moultonborough voted for three representatives and voters in the other three towns voted for two representatives.

Also in the 1992 plan, Carroll County District 8 consisted of one floterial representative for Wakefield, Wolfeboro and Brookfield. In addition, Wakefield was a single-member district with one representative for the town's population of 3,057 and Wolfeboro was a single-member district with one representative for the town's population of 4,807. Because of the floterial, voters in both Wakefield and Wolfeboro voted for two representatives, despite the difference in the population of these towns.

Finally, Carroll County District 3, a floterial, consisted of six communities: Bartlett (population 2,290), Chatham (population 268), Conway (population 7,940), Hale's Location (population 0), Hart's Location (population 36), and Jackson (population 678). Using 1990 census figures, the combined population of the six communities in District 3 was 11,212. The floterial representative covered all six communities in District 3. Additionally, four of the six communities in District 3 (Bartlett, Chatham, Hart's Location and Jackson with a combined total population of 3,272) were also in District 1, a single-member district; the other two communities in District 3 (Conway and Hale's Location with a combined total population of 7,940) were in District 2, a multi-member district with two representatives. The result of this configuration was that voters in Hart's Location, population 36, voted for the same number of representatives as the voters in Bartlett, population 2,290.

We select Carroll County as an example because it best illustrates that floterials are usually complicated and often confusing. By contrast, the court plan for Carroll County, attached as Appendix B, simply has one single-member district and four multi-member districts, each with four or fewer representatives. Moreover, as explained more fully in Sections III and IV below, when the towns within a floterial have vastly different

populations, the use of the floterial can cause substantial deviations from the one person/one vote principle. *See* G. Moncrief & R. Joula, *supra* at 745. While the New Hampshire Constitution specifically contemplates the use of multi-member districts, *see* N.H. CONST. pt. II, art. 11, it is silent as to floterials.

### B. Other State Constitutional Principles

In addition to requiring that representative districts be drawn "as equal as circumstances will admit," the New Hampshire Constitution directs that any apportionment be based upon "the last general census of the inhabitants of the state taken by authority of the United States or of this state." *McGovern v. Secretary of State*, 138 N.H. 128, 131 (1993) (quotation omitted); N.H. CONST. pt. II, art. 9. The State Constitution also mandates that: (1) the house of representatives be comprised of no fewer than 375 and no more than 400 members; (2) no town, ward or place be divided unless it requests to be divided by referendum; and (3) the boundaries of towns, wards and places be preserved. N.H. CONST. pt. II, arts. 9, 11, 11-a. As previously discussed, the New Hampshire Constitution also requires that the towns, wards and places in a district be "reasonably proximate to one another." N.H. CONST. pt. II, art. 11.

### C. Traditional Reapportionment Principles

We also consider the State's traditional redistricting policy of maintaining county boundaries. *See Boyer v. Gardner*, 540 F. Supp. 624, 629-30 (D.N.H. 1982). Preserving county boundaries has been important historically because "the state representatives of the districts of each county comprise the County Convention, which has the power to raise county taxes, make appropriations, and authorize the purchase or sale of county real estate." *Id.* at 630 n.10; RSA 24:1 (2000), :13 (2000), :13-a (2000).

A second consideration is that representative districts have traditionally been comprised of contiguous territories. "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme." *Reynolds*, 377 U.S. at 578.

### III. Determining Whether a Plan Complies with One Person/One Vote

The established method to determine whether a reapportionment plan affords citizens an equal right to vote is to calculate the extent to which the plan deviates from the ideal district population. *See New York City Bd. of Estimate v. Morris*, 489 U.S. 688, 700, 700-01 n.7 (1989). The first step is to determine the ideal population. To calculate the ideal population of a

single-member district, the state population is divided by the total number of state representatives. In New Hampshire, assuming that the house contains 400 members, the ideal population for a single-member district is 3,089 (1,235,786 people divided by 400 representatives). The ideal population for a multi-member district is expressed as a multiple of the ideal population for a single-member district. In New Hampshire, the ideal population for a district with three representatives is 3,089 multiplied by 3, or 9,267.

Once the ideal population is calculated, it is then possible to determine the extent to which a given district population deviates from the ideal. Relative deviation is the most commonly used measure and is derived by dividing the difference between the district's population and the ideal population by the ideal population.

For example, the relative deviation for a single-member district in New Hampshire with a population of 4,000 is calculated by subtracting 3,089 from 4,000 and dividing the difference (+911) by 3,089. The relative deviation is 29%. For a multi-member district, the relative deviation is calculated using the "aggregate method," which aggregates the total number of representatives and the total population in the district to calculate deviation. Thus, for a district with a population of 8,000 and three representatives, the difference between 8,000 and 3 x 3,089 (9,267) is divided by 9,267, and the relative deviation is -14%.

Using the relative deviation, one can calculate the range of deviation by adding the largest positive deviation and the largest negative deviation without regard to algebraic sign. *See Abrams v. Johnson*, 521 U.S. 74, 98 (1997). Thus, in the example above, 29% and -14% yields a range of deviation of 43%.

*IV. Plans Submitted by the Parties*

We have carefully reviewed each plan against the neutral principles set forth above. All of the plans submitted for our consideration suffer from the same flaws. None is appropriate for wholesale adoption by the court. Moreover, none is appropriate for use as the court's starting point.

First, all of the plans contain erroneous population figures. All of the submitted plans were based upon ward boundaries drawn after the 2000 federal census was conducted. None of the plans identified which boundaries had changed, their location, or the data from which the changes were derived.

Despite repeated requests, the parties did not forward this information to the court until July 1, 2002. After the court received the information, it discovered that there were discrepancies between the ward populations as reported by various cities and as reported in federal census data. This fact

alone would require us to reject the parties' plans. However, the court notified the parties of the discrepancies, and on July 16, 2002, the parties filed a joint stipulation to the accuracy of most of the federal census data. The only portion of the data the parties disputed concerned the federal census data for Manchester wards 5, 6 and 7 as reconfigured after the 2000 census. After reviewing the boundaries used by the city of Manchester for wards 5, 6 and 7, the court learned that the city did not use census block features as ward lines in two areas in these wards. Accordingly, the court used the census block features that were closest to the ward lines set by the city.

Although the parties stipulated to the federal census figures for all other cities with changed wards, the cities of Dover and Claremont filed separate partial objections to the figures for their cities. The court was able to verify the information submitted by Dover, but was not able to verify the information submitted by Claremont. Thus, the court used the information submitted by Dover in constructing its plan, but did not use the information submitted by Claremont.

More importantly, *all* of the plans miscalculate the extent to which they deviate from the one person/one vote principle. All of the plans rely upon floterials and use the aggregate method to calculate the deviation of the floterials. The aggregate method is appropriate for multi-member districts, but is not appropriate for the floterials in the parties' plans because it masks substantial deviation from the one person/one vote principle.

For example, in the plan submitted by the house, the towns of Epping (population 5,476) and Fremont (population 3,510) are combined in a floterial with one representative. Each town also constitutes a single-member district and thus each town has its own representative. The plan calculates the deviation as if all three representatives represent both towns together (-3.03%). In fact, each town is represented by one representative as well as a floterial representative. Thus, treating this floterial as if it were simply a three-member district is misleading.

Similarly, in the plans submitted by the speaker of the house, Brentwood, Epping and Fremont are single-member districts and all three are also part of a floterial. The plans calculate the deviation as if the representative for Epping, the representative for Fremont, the representative for Brentwood, and the floterial representative represent all four towns. They do not. In fact, each town is represented by its own representative and also the floterial representative. Again, treating this floterial as if it were simply a four-member district distorts the actual deviation.

The parties rely upon *Boyer*, 540 F. Supp. 624, as support for their use of the aggregate method. In *Boyer*, the United States District Court for the District of New Hampshire reviewed the constitutionality of the seventeen floterials included in the 1982 New Hampshire legislative apportionment plan under the Federal Constitution. *Id.* at 625-26. In assessing the validity of the floterials, the court ruled that it was proper to apply the aggregate method of calculating the range of deviation. *Id.* at 627-28. *Boyer*, however, is not binding on this court when we are construing our own constitution. Moreover, we believe that, particularly as used by the parties in this case, the aggregate method obscures substantial deviations from the one person/one vote principle. *See* G. Moncrief & R. Joula, *supra* at 745.

No party has argued that, to the extent a plan relies upon floterials, the deviations for the floterials should be calculated using the component method. *See* Appendix C. Nor has any party relied upon *Morris*, 489 U.S. at 700-02, 702 n.9, in which the court apparently relied upon a version of the component method to calculate total deviation in districts that had both single-member and at-large representatives. Here, unlike *Morris*, we have a record devoid of application of the component method to floterials.

Nonetheless, our own calculations indicate that even using the component method, the range of deviation produced by the floterials in the plans submitted is unacceptably high. For example, in the speaker's plans, the deviation created by the Rockingham District 25 floterial (Brentwood, Epping and Fremont) is -18.1% for Brentwood and +22.3% for Epping, yielding an overall deviation of 40.4%. In the house plan, the deviation created by the Rockingham District 24 floterial (Fremont and Epping) is -18.3% for Fremont and +10.1% for Epping, yielding a total deviation of 28.4%. In the petitioners' plan, the deviation created by the Rockingham District 9 floterial (Epping, Newfields, Newmarket and Nottingham) for Epping alone is 37.2%. Even without analysis of all of the floterials in each plan, these few examples demonstrate impermissible deviations, which are also far in excess of the deviation in the plan the court establishes today.

Another method for calculating the deviation for a floterial is the same as the method for calculating the deviation for a single-member district; this method results in exceptionally high deviations. Under this method, the ideal population (3,089) is subtracted from the floterial population and the result is divided by the ideal population. For example, a floterial that has a population of 10,000 — and there are many this size or larger in the plans submitted — would have a deviation of 223%.

Because each plan miscalculates the deviation for floterials, the plans necessarily miscalculate their range of deviation. The properly calculated ranges of deviation for all of the submitted plans significantly exceed "the

range of constitutional tolerance." *Opinion of the Justices*, 307 A.2d at 209. All of the submitted plans thus deviate substantially and impermissibly from the one person/one vote principle.

Further, all of the submitted plans openly embrace political agendas. For instance, in the plan submitted by the speaker, he asserts, over the minority leader's objection, that one of the districts was created "despite a high deviation and a subsequently necessary floterial, at the request of the Minority Leader." Similarly, in the supporting memorandum submitted by the house, the house notes that certain districts have been apportioned to preserve incumbent seats, the apportionment of one district in Merrimack County "was part of a bi-partisan agreement," and the apportionment of a district in Sullivan County was also "a political agreement." At oral argument, the parties accused each other of crafting apportionment plans to achieve partisan advantage. While political considerations are tolerated in legislatively-implemented redistricting plans, they have no place in a court-ordered plan. *See Wilson v. Eu*, 823 P.2d 545, 576-77 (Cal. 1992); *see also Wyche v. Madison Parish Police Jury*, 769 F.2d 265, 268 (5th Cir. 1985) (*per curiam*).

The degree to which the submitted plans may reflect political considerations is perhaps best illustrated by how each plan treats the same cities and towns differently. For example, in the speaker's plans, the city of Berlin (population 10,331) constitutes a multi-member district with three representatives and is also part of a two-representative floterial that includes twenty-two other towns (from Bean's Grant to Whitefield).

By contrast, in the house plan, Berlin has no dedicated representatives. Rather, it is part of two multi-member districts, each with two representatives. The first multi-member district has thirteen other towns and the second has nineteen other towns. The towns in the first multi-member district are also part of the second multi-member district.

In the petitioners' plan, Berlin, Jefferson, Milan and Randolph are in one multi-member district that has four representatives. And, in the *amici* plan, Berlin, along with eight other towns, is part of a multi-member district that has four representatives.

Based upon our review of the submitted plans, we conclude that none can be adopted by the court. Each plan relies upon incorrect population data. Each plan miscalculates the overall range of population deviation. Each plan has "calculated partisan political consequences (the details of which are unknown). . . . We have no principled way to choose [among] the plans, especially knowing that we would be endorsing an unknown but intended political consequence by the choice we make." *Wilson*, 823 P.2d at 576-77.

Accordingly, the court has devised a reapportionment plan consistent with neutral State and federal constitutional principles.

*V. Court's Plan*

The court's plan, which is attached as Appendix D, retains the same number of representatives (400) as in the 1992 house plan. The court's plan creates eighty-eight representative districts, none of which is a floterial. Five are single-member districts, fourteen are two-member districts, twenty-four are three-member districts, fourteen are four-member districts and thirty-one are districts with more than four representatives. Thus, 65% of the districts have four or fewer representatives.

All of the districts are comprised of contiguous territories. No town, ward or place was divided unless it had requested division by referendum. *See* N.H. CONST. pt. II, arts. 11, 11-a. Nor were county boundaries crossed in creating the districts.

The court's plan has a range of deviation of 9.26%, which is dramatically lower than the range of deviation in any of the submitted plans. The plan's deviation range was derived by adding the deviations of the highest relative positive deviation (Nashua ward 2 at +4.72%) and the highest negative relative deviation (Manchester ward 9 at -4.54%). These deviations were calculated by using the traditional method to calculate the deviations of single-member and multi-member districts. *See Morris*, 489 U.S. at 700, 700-01 n.7. Given the small population of this State, the unusually large size of its house of representatives, and our State Constitution and traditional redistricting policies, we hold that a deviation range of approximately 9% achieves "substantial equality." *Reynolds*, 377 U.S. at 579.

New Hampshire has the largest state house of representatives in the country. *See* Council of State Governments, 33 THE BOOK OF THE STATES at 70 (2000). New Hampshire also has one of the smallest state populations in the country. According to the 2000 federal census, New Hampshire ranks 41st in population. *See* U.S. Census Bureau, STATISTICAL ABSTRACT OF THE UNITED STATES: 2001 at 21 (121st ed. 2001). Because New Hampshire has such a large house of representatives (400 members) and such a small population (1,235,786), it takes very few people to affect deviation substantially. For instance, a 10% deviation represents only 309 people, and a 1% deviation represents a mere 31 people.

By contrast, Pennsylvania, with the next largest house of representatives (203) has a much larger population (12,281,054, according to the 2000 census). *See* Council of State Governments, *supra* at 70; U.S. Census Bureau, STATE AND COUNTY QUICKFACTS PENNSYLVANIA,

*available at* http://quickfacts.census.gov/qfd/states/42000.html. The ideal district population in Pennsylvania is 60,498 — about twenty times the size of the ideal district population in New Hampshire. A 10% deviation from the ideal district population in Pennsylvania represents 6,050 individuals — about twenty times the number of individuals represented by a 10% deviation from the ideal district population in New Hampshire (309 people).

Even Maine, with a population that is similar in size to New Hampshire's (1,274,923, according to the 2000 census), has a larger ideal district population than does New Hampshire. U.S. Census Bureau, STATE AND COUNTY QUICKFACTS MAINE, *available at* http://quickfacts.census.gov/qfd/states/23000.html. The ideal district population in Maine is 8,443. This is because the size of the Maine House of Representatives is only 151 representatives, compared to New Hampshire's 400 representatives. *See* Council of State Governments, *supra* at 70. A 10% deviation in Maine represents more than 800 people — almost three times the number of individuals represented by the same deviation from the ideal district in New Hampshire (309 persons).

The court did not use the 1992 house districting plan as its starting point because it was of dubious constitutionality at the time it was passed. The range of deviation for the 1992 plan, using the 1990 census figures, was at least 49.7%. Deviations in this range are too high to be justified by any state interest. *See Gaffney v. Cummings*, 412 U.S. 735, 744 (1973); *Morris*, 489 U.S. at 702.

Moreover, the 1992 plan relied heavily upon floterials. Although it ostensibly contained seventy-two single-member districts, only nine of these districts were true single-member districts. The rest were created by floterials. For the reasons stated above, we reject floterials as an unsound redistricting device. The range of deviation calculated above did not include the floterials. Had they been included in the calculation using the component method, the range of deviation would likely have been higher.

The court attempted to create as many true single-member districts as possible, but the mathematical reality is that only a handful of towns have a population that is close to the ideal district population of 3,089.

Although the court's plan achieves a range of deviation that complies with the one person/one vote principle, the court considered taking steps to reduce the deviation range even further. The court discovered, however, that reducing the range of deviation further required dividing wards into single-member districts. Dividing wards would violate Part II, Article 11-a of the New Hampshire Constitution. Indeed, if the court divided one ward, it would have no principled basis for keeping the boundaries of any other

ward intact. In other words, if the court were to ignore the boundaries of one town, ward or place to create a single-member district, it would have no valid reason not to create single-member districts statewide.

Although creating 400 single-member districts statewide would have resulted in little or no deviation, such a radical restructuring of the house was not only not required by the one person/one vote principle, but would have contravened other State constitutional imperatives.

The court endeavored to create multi-member districts that had as few representatives as possible because of its concern that large multi-member districts may tend to dilute the voting strength of racial or political elements of the voting population. *See Opinion of the Justices*, 111 N.H. at 151. Although we are not called upon, today, to determine the effect of RSA 656:5 (Supp. 2001), requiring majority party candidates for the house to be listed first on all ballots, the number and size of multi-member districts in this plan may justify the concern about the statute raised at oral argument by the *amici*.

Large multi-member districts exist in the court's plan for three reasons: (1) the city or town did not request division, *see* N.H. CONST. pt. II, art. 11-a; (2) a city divided into wards had not properly drawn its ward boundaries; or (3) joining contiguous towns and/or joining contiguous wards was required to produce deviations within the 5% range.

For instance, the court discovered that in the city of Rochester, city officials used features unrecognized by the United States Census Bureau as ward boundaries and used its own enumeration, instead of federal census data, to determine ward populations. "An actual census taken by an individual city . . . [is] not . . . a general census taken by the authority of the United States or of this State," as required by Part II, Article 9 of the New Hampshire Constitution, and may "not be used as a basis for apportionment." *Opinion of the Justices*, 111 N.H. at 150 (quotation omitted). Accordingly, the court was required to consider the city of Rochester as a whole and did not use the city's ward boundaries. It is now the largest multi-member district.

Similarly, the court was forced to consider the city of Claremont as a whole, rather than to use its ward boundaries, because the court was not able to verify the population totals provided by the city for its adjusted wards.

One of the largest multi-member districts, Salem/Windham, has 13 representatives, the same number which the two communities had between them under the 1992 plan.

In Manchester, wards 2, 3, 10 and 11 are combined into an eleven representative multi-member district because it was the only combination

of wards that considered in light of all other towns, wards and places, would produce a deviation of less than 5%.

In devising the reapportionment plan, the court did not consider the impact upon either political parties or incumbency.

*VI. Conclusion*

The court recognizes that its redistricting plan changes house districts significantly. These changes were unavoidable because past house districting plans have not given the fundamental democratic principle of one person/one vote the attention and weight to which it is entitled. The court's plan reinstates the primacy of this principle and ensures that "the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Reynolds,* 377 U.S. at 579.

This plan is effective immediately and the injunction against the house filing period is dissolved as of 12:01 a.m. July 31, 2002. Unless otherwise ordered by the court, the filing of any motion to reconsider shall not stay the effective date of the plan.

*So ordered.*

BROCK, C.J., and NADEAU, DALIANIS and DUGGAN, JJ., concurred.

### INDEX TO APPENDICES

Carroll County N.H. House Districts 1992 .....................................Appendix  A
Carroll County House Districts Court Plan 2002........................Appendix  B
Component Method .......................................................................Appendix  C
N.H. House Districts Court Plan 2002 ..........................................Appendix  D
Manchester Area Map Court Plan 2002 ........................................Appendix  E
Nashua Area Map Court Plan 2002 ...............................................Appendix  F
Concord Area Map Court Plan 2002...............................................Appendix  G
Dover Area Map Court Plan 2002...................................................Appendix  H
Population Summary Report Court Plan 2002 ..............................Appendix  I
Full Geography Report Court Plan 2002 .......................................Appendix  J

## APPENDIX A

**Carroll County
New Hampshire House Districts 1992**

APPENDIX B

Carroll County House Districts
New Hampshire Supreme Court Plan 2002

# APPENDIX C

## Component Method

*To Calculate Ratio Share*

Divide the town population by the total population – this assigns each town their share of the floterial plus their dedicated seats – divide by total seats and convert to percentage

$3,286 \div 27,640 = .1188 = 11.9\%$

*To Calculate Deviation*

Ratio Share + Other Seats in Town = Adjusted Number of Seats

$1 + .119 = 1.119$

Town Population ÷ Adjusted Seats = Component Population

$3286 \div 1.119 = 2936.55$

(Component Population – Ideal Population) ÷ Ideal Population =

$2936.55 - 2773 = 163.55 \div 2773 = .0589 = 5.89\%$

See N.H. Redistricting Committee, Methods for Calculating Deviation, available at http://gencourt.state.nh.us/houseredistrict/deviationcalculation.html.

# APPENDIX D

State of New Hampshire
House Districts
Supreme Court Plan 2002
with Townships and Adjusted City Wards
for Concord, Dover, Manchester and Nashua

## APPENDIX E

State of New Hampshire
House Districts
Supreme Court Plan 2002
with Townships and Adjusted City Wards
for Manchester Area

# APPENDIX F

State of New Hampshire
House Districts
Supreme Court Plan 2002
with Townships and Adjusted City Wards
for Nashua Area

# APPENDIX G

State of New Hampshire
House Districts
Supreme Court Plan 2002
with Townships and Adjusted City Wards
for Concord Area

# APPENDIX H

State of New Hampshire
House Districts
Supreme Court Plan 2002
with Townships and Adjusted City Wards
for Dover Area

# APPENDIX I

State of New Hampshire
House Districts
Supreme Court Plan 2002
Population Summary Report

| DISTRICT | Seat(s) | PERSONS | TARGET | %DEV | BLACK | HISPANIC | AMERIND | ASIAN | HAWPAC | OTHER |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 6020 | 3089 | -2.56% | 2 | 29 | 17 | 10 | 2 | 9 |
| 2 | 5 | 15044 | 3089 | -2.60% | 18 | 100 | 47 | 73 | 2 | 24 |
| 3 | 4 | 12047 | 3089 | -2.50% | 20 | 72 | 29 | 40 | 1 | 20 |
| 4 | 4 | 12499 | 3089 | 1.16% | 25 | 48 | 37 | 79 | 1 | 41 |
| 5 | 1 | 3013 | 3089 | -2.46% | 3 | 20 | 15 | 6 | 2 | 8 |
| 6 | 3 | 9310 | 3089 | 0.46% | 20 | 36 | 26 | 19 | 0 | 12 |
| 7 | 4 | 12715 | 3089 | 2.91% | 16 | 74 | 19 | 52 | 0 | 5 |
| 8 | 2 | 6129 | 3089 | -0.79% | 9 | 31 | 25 | 11 | 1 | 9 |
| 9 | 2 | 6332 | 3089 | 2.49% | 23 | 86 | 34 | 50 | 3 | 37 |
| 10 | 1 | 3123 | 3089 | 1.10% | 4 | 20 | 18 | 14 | 0 | 4 |
| 11 | 2 | 5967 | 3089 | -3.42% | 2 | 24 | 16 | 25 | 0 | 7 |
| 12 | 1 | 2982 | 3089 | -3.46% | 6 | 21 | 6 | 7 | 1 | 12 |
| 13 | 2 | 6312 | 3089 | 2.17% | 22 | 35 | 13 | 26 | 1 | 10 |
| 14 | 2 | 6175 | 3089 | -0.05% | 11 | 33 | 15 | 34 | 5 | 16 |
| 15 | 2 | 6351 | 3089 | 2.80% | 27 | 86 | 9 | 50 | 0 | 38 |
| 16 | 3 | 9677 | 3089 | 4.42% | 25 | 61 | 24 | 77 | 1 | 24 |
| 17 | 7 | 22256 | 3089 | 2.93% | 211 | 342 | 66 | 796 | 7 | 116 |
| 18 | 4 | 12568 | 3089 | 1.72% | 104 | 206 | 54 | 335 | 4 | 51 |
| 19 | 2 | 6069 | 3089 | -1.76% | 17 | 28 | 16 | 20 | 3 | 13 |
| 20 | 3 | 9511 | 3089 | 2.63% | 9 | 62 | 34 | 26 | 0 | 15 |
| 21 | 1 | 3055 | 3089 | -1.10% | 6 | 14 | 6 | 11 | 1 | 10 |
| 22 | 5 | 15652 | 3089 | 1.34% | 42 | 79 | 44 | 84 | 5 | 16 |
| 23 | 2 | 6171 | 3089 | -0.11% | 22 | 38 | 19 | 9 | 0 | 4 |
| 24 | 4 | 12027 | 3089 | -2.66% | 23 | 83 | 55 | 40 | 1 | 13 |
| 25 | 7 | 22563 | 3089 | 4.35% | 89 | 172 | 45 | 153 | 7 | 50 |
| 26 | 5 | 14986 | 3089 | -2.97% | 50 | 95 | 63 | 38 | 16 | 24 |
| 27 | 4 | 11846 | 3089 | -4.13% | 18 | 83 | 28 | 49 | 1 | 14 |
| 28 | 4 | 12403 | 3089 | 0.38% | 91 | 96 | 35 | 70 | 1 | 30 |
| 29 | 3 | 9004 | 3089 | -2.84% | 12 | 67 | 27 | 47 | 3 | 14 |
| 30 | 7 | 22354 | 3089 | 3.38% | 100 | 192 | 78 | 154 | 8 | 57 |
| 31 | 8 | 24967 | 3089 | 1.03% | 53 | 159 | 65 | 110 | 2 | 21 |
| 32 | 2 | 6331 | 3089 | 2.48% | 12 | 34 | 4 | 37 | 2 | 8 |
| 33 | 3 | 9397 | 3089 | 1.40% | 33 | 102 | 24 | 47 | 2 | 29 |
| 34 | 6 | 18871 | 3089 | 1.82% | 41 | 137 | 41 | 81 | 6 | 38 |
| 35 | 6 | 17926 | 3089 | -3.28% | 59 | 121 | 31 | 65 | 3 | 23 |
| 36 | 3 | 9133 | 3089 | -1.45% | 30 | 45 | 26 | 29 | 0 | 6 |
| 37 | 8 | 24516 | 3089 | -0.79% | 123 | 290 | 48 | 230 | 3 | 50 |
| 38 | 4 | 12594 | 3089 | 1.93% | 147 | 254 | 44 | 136 | 0 | 23 |
| 39 | 5 | 16062 | 3089 | 3.99% | 195 | 210 | 40 | 254 | 13 | 65 |
| 40 | 4 | 12031 | 3089 | -2.63% | 79 | 127 | 36 | 208 | 0 | 51 |
| 41 | 3 | 9364 | 3089 | 1.05% | 11 | 42 | 17 | 84 | 0 | 22 |
| 42 | 3 | 9317 | 3089 | 0.54% | 22 | 53 | 36 | 62 | 0 | 8 |
| 43 | 2 | 6413 | 3089 | 3.80% | 19 | 47 | 23 | 12 | 2 | 22 |
| 44 | 4 | 12756 | 3089 | 3.24% | 53 | 98 | 20 | 104 | 3 | 25 |
| 45 | 4 | 12797 | 3089 | 3.57% | 38 | 101 | 18 | 48 | 0 | 45 |
| 46 | 4 | 12343 | 3089 | -0.11% | 39 | 114 | 17 | 147 | 8 | 21 |
| 47 | 8 | 24304 | 3089 | -1.65% | 168 | 267 | 33 | 269 | 3 | 51 |
| 48 | 8 | 24705 | 3089 | -0.03% | 56 | 195 | 57 | 86 | 2 | 72 |
| 49 | 6 | 17712 | 3089 | -4.44% | 306 | 417 | 26 | 546 | 2 | 156 |
| 50 | 11 | 35509 | 3089 | 4.50% | 907 | 1926 | 145 | 725 | 21 | 839 |
| 51 | 3 | 8900 | 3089 | -3.96% | 216 | 432 | 27 | 243 | 3 | 172 |
| 52 | 3 | 9070 | 3089 | -2.13% | 251 | 892 | 38 | 324 | 3 | 363 |
| 53 | 3 | 90 . | ... | -2.13% | 130 | 588 | 30 | 176 | 2 | 147 |
| 54 | 3 | 8978 | 89 | -3.12% | 103 | 137 | 18 | 163 | 0 | 52 |
| 55 | 3 | 8846 | 3089 | -4.54% | 270 | 329 | 26 | 132 | 3 | 105 |

State of New Hampshire
House Districts
Supreme Court Plan 2002
Population Summary Report

| DISTRICT | SEATS | PERSONS | IDEAL | DEV % | BLACK | HISPANIC | AM IND | ASIAN | HAW PAC | OTHER |
|---|---|---|---|---|---|---|---|---|---|---|
| 56 | 3 | 8921 | 3089 | -3.73% | 63 | 223 | 16 | 178 | 4 | 46 |
| 57 | 6 | 18274 | 3089 | -1.40% | 59 | 165 | 11 | 234 | 4 | 23 |
| 58 | 11 | 32479 | 3089 | -4.41% | 223 | 333 | 69 | 420 | 10 | 65 |
| 59 | 3 | 9704 | 3089 | 4.72% | 179 | 435 | 18 | 519 | 2 | 227 |
| 60 | 3 | 9698 | 3089 | 4.65% | 193 | 765 | 58 | 165 | 0 | 256 |
| 61 | 3 | 9551 | 3089 | 3.06% | 141 | 175 | 20 | 254 | 5 | 56 |
| 62 | 6 | 19195 | 3089 | 3.57% | 521 | 2544 | 92 | 315 | 8 | 1419 |
| 63 | 3 | 9625 | 3089 | 3.86% | 116 | 162 | 8 | 238 | 2 | 55 |
| 64 | 3 | 9578 | 3089 | 0.00% | 116 | 247 | 19 | 532 | 3 | 84 |
| 65 | 6 | 19254 | 3089 | 3.88% | 474 | 1060 | 60 | 1340 | 9 | 545 |
| 66 | 11 | 33842 | 3089 | -0.40% | 241 | 461 | 58 | 369 | 13 | 152 |
| 67 | 14 | 42586 | 3089 | -1.53% | 233 | 456 | 86 | 372 | 10 | 144 |
| 68 | 8 | 24445 | 3089 | -1.08% | 41 | 180 | 59 | 77 | 4 | 40 |
| 69 | 3 | 8996 | 3089 | -2.92% | 153 | 115 | 18 | 146 | 7 | 46 |
| 70 | 3 | 8998 | 3089 | -2.90% | 101 | 119 | 22 | 344 | 7 | 29 |
| 71 | 3 | 8890 | 3089 | -4.07% | 47 | 72 | 13 | 145 | 1 | 18 |
| 72 | 6 | 18318 | 3089 | -1.17% | 127 | 213 | 40 | 476 | 24 | 56 |
| 73 | 5 | 14930 | 3089 | -3.33% | 41 | 91 | 41 | 73 | 7 | 29 |
| 74 | 3 | 9674 | 3089 | 4.39% | 54 | 76 | 23 | 18 | 5 | 25 |
| 75 | 9 | 27918 | 3089 | 0.42% | 139 | 400 | 51 | 288 | 6 | 86 |
| 76 | 13 | 38821 | 3089 | -3.33% | 190 | 658 | 66 | 806 | 31 | 269 |
| 77 | 11 | 34021 | 3089 | 0.12% | 305 | 643 | 71 | 362 | 16 | 205 |
| 78 | 2 | 6178 | 3089 | 0.00% | 16 | 43 | 4 | 73 | 0 | 13 |
| 79 | 11 | 34864 | 3089 | 2.60% | 92 | 309 | 55 | 142 | 9 | 99 |
| 80 | 4 | 12163 | 3089 | -1.40% | 44 | 116 | 23 | 64 | 2 | 49 |
| 81 | 2 | 6073 | 3089 | -1.70% | 31 | 62 | 8 | 9 | 2 | 34 |
| 82 | 3 | 9578 | 3089 | 3.36% | 53 | 147 | 16 | 254 | 0 | 38 |
| 83 | 8 | 24672 | 3089 | -0.16% | 82 | 196 | 29 | 212 | 0 | 59 |
| 84 | 4 | 12551 | 3089 | 1.58% | 35 | 84 | 23 | 70 | 4 | 31 |
| 85 | 5 | 14937 | 3089 | -3.29% | 59 | 135 | 26 | 129 | 10 | 37 |
| 86 | 7 | 21559 | 3089 | -0.30% | 456 | 294 | 46 | 516 | 5 | 59 |
| 87 | 1 | 3208 | 3089 | 3.85% | 9 | 23 | 1 | 39 | 1 | 4 |
| 88 | 2 | 6192 | 3089 | 0.23% | 13 | 37 | 4 | 29 | 0 | 5 |
| Totals | 400 | 1235786 | | | 9013 | 20429 | 2959 | 15863 | 370 | 7411 |

# APPENDIX J

State of New Hampshire
House Districts
Supreme Court Plan 2002
Full Geography Report

| DISTRICT | SEATS | COUNTY | TOWNSHIP/WARD | PERSONS | Deviation |
|---|---|---|---|---|---|
| 001 | 2 | Coos County | Atkinson & Gilmanton Academy Grant | 12 | |
| | | Coos County | Cambridge | 10 | |
| | | Coos County | Clarksville | 294 | |
| | | Coos County | Colebrook | 2321 | |
| | | Coos County | Columbia | 750 | |
| | | Coos County | Dixs Grant | 0 | |
| | | Coos County | Dixville | 75 | |
| | | Coos County | Dummer | 309 | |
| | | Coos County | Errol | 298 | |
| | | Coos County | Ervings Location | 1 | |
| | | Coos County | Millsfield | 22 | |
| | | Coos County | Odell | 5 | |
| | | Coos County | Pittsburg | 867 | |
| | | Coos County | Second College Grant | 0 | |
| | | Coos County | Stewartstown | 1012 | |
| | | Coos County | Wentworth Location | 44 | |
| Totals | | | | 6020 | -2.56% |
| 002 | 5 | Coos County | Beans Grant | 0 | |
| | | Coos County | Carroll | 663 | |
| | | Coos County | Chandlers Purchase | 0 | |
| | | Coos County | Crawfords Purchase | 0 | |
| | | Coos County | Cutts Grant | 0 | |
| | | Coos County | Dalton | 927 | |
| | | Coos County | Gorham | 2895 | |
| | | Coos County | Greens Grant | 0 | |
| | | Coos County | Hadleys Purchase | 0 | |
| | | Coos County | Jefferson | 1006 | |
| | | Coos County | Kilkenny | 0 | |
| | | Coos County | Lancaster | 3280 | |
| | | Coos County | Low and Burbanks Grant | 0 | |
| | | Coos County | Martins Location | 0 | |
| | | Coos County | Northumberland | 2438 | |
| | | Coos County | Pinkhams Grant | 0 | |
| | | Coos County | Randolph | 339 | |
| | | Coos County | Sargents Purchase | 0 | |
| | | Coos County | Stark | 516 | |
| | | Coos County | Stratford | 942 | |
| | | Coos County | Thompson and Meserves Purchase | 0 | |
| | | Coos County | Whitefield | 2038 | |
| Totals | | | | 13454 | -2.60% |
| 003 | 4 | Coos County | Beans Purchase | 4 | |
| | | Coos County | Berlin city | 10331 | |
| | | Coos County | Milan | 1331 | |
| | | Coos County | Shelburne | 379 | |
| | | Coos County | Success | 2 | |
| | | | | 12047 | -2.50% |
| 004 | 4 | Carroll County | Bartlett | 2705 | |
| | | Carroll County | Chatham | 260 | |
| | | Carroll County | Conway | 8604 | |
| | | Carroll County | Hale's Location | 58 | |

State of New Hampshire
House Districts
Supreme Court Plan 2002
Full Geography Report

| DISTRICT | SEATS | COUNTY | TOWNSHIP/WARD | PERSONS | Deviation |
|----------|-------|--------|---------------|---------|-----------|
| | | Carroll County | Hart's Location | 37 | |
| | | Carroll County | Jackson | 835 | |
| Totals | | | | 12499 | 1.16% |
| 005 | 1 | Carroll County | Albany | 654 | |
| | | Carroll County | Eaton | 375 | |
| | | Carroll County | Madison | 1984 | |
| Totals | | | | 3013 | -2.46% |
| 006 | 3 | Carroll County | Freedom | 1303 | |
| | | Carroll County | Ossipee | 4211 | |
| | | Carroll County | Sandwich | 1286 | |
| | | Carroll County | Tamworth | 2510 | |
| Totals | | | | 9310 | 0.46% |
| 007 | 4 | Carroll County | Moultonborough | 4484 | |
| | | Carroll County | Tuftonboro | 2148 | |
| | | Carroll County | Wolfeboro | 6083 | |
| Totals | | | | 12715 | 2.91% |
| 008 | 2 | Carroll County | Brookfield | 604 | |
| | | Carroll County | Effingham | 1273 | |
| | | Carroll County | Wakefield | 4252 | |
| Totals | | | | 6129 | -0.79% |
| 009 | 2 | Grafton County | Littleton | 5845 | |
| | | Grafton County | Lyman | 487 | |
| Totals | | | | 6332 | 2.49% |
| 010 | 1 | Grafton County | Bethlehem | 2199 | |
| | | Grafton County | Franconia | 924 | |
| Totals | | | | 3123 | 1.10% |
| 011 | 2 | Grafton County | Bath | 893 | |
| | | Grafton County | Easton | 256 | |
| | | Grafton County | Landaff | 378 | |
| | | Grafton County | Lincoln | 1271 | |
| | | Grafton County | Lisbon | 1587 | |
| | | Grafton County | Livermore | 3 | |
| | | Grafton County | Monroe | 759 | |
| | | Grafton County | Sugar Hill | 563 | |
| | | Grafton County | Waterville Valley | 257 | |
| Totals | | | | 5967 | -3.42% |
| 012 | 1 | Grafton County | Thornton | 1843 | |
| | | Grafton County | Woodstock | 1139 | |
| Totals | | | | 2982 | -3.46% |

State of New Hampshire
House Districts
Supreme Court Plan 2002
Full Geography Report

| DISTRICT | SEATS | COUNTY | TOWNSHIP/WARD | PERSONS | Deviation |
|---|---|---|---|---|---|
| 013 | 2 | Grafton County | Benton | 314 | |
| | | Grafton County | Haverhill | 4416 | |
| | | Grafton County | Piermont | 709 | |
| | | Grafton County | Warren | 873 | |
| Totals | | | | 6312 | 2.27% |
| 014 | 2 | Grafton County | Campton | 2719 | |
| | | Grafton County | Ellsworth | 87 | |
| | | Grafton County | Orford | 1091 | |
| | | Grafton County | Rumney | 1480 | |
| | | Grafton County | Wentworth | 798 | |
| Totals | | | | 6175 | -0.05% |
| 015 | 2 | Grafton County | Hebron | 459 | |
| | | Grafton County | Plymouth | 5892 | |
| Totals | | | | 6351 | 2.80% |
| 016 | 3 | Grafton County | Alexandria | 1329 | |
| | | Grafton County | Ashland | 1955 | |
| | | Grafton County | Bridgewater | 974 | |
| | | Grafton County | Bristol | 3033 | |
| | | Grafton County | Groton | 456 | |
| | | Grafton County | Holderness | 1930 | |
| Totals | | | | 9677 | 4.42% |
| 017 | 7 | Grafton County | Canaan | 3319 | |
| | | Grafton County | Dorchester | 353 | |
| | | Grafton County | Enfield | 4618 | |
| | | Grafton County | Grafton | 1138 | |
| | | Grafton County | Hanover | 10850 | |
| | | Grafton County | Lyme | 1679 | |
| | | Grafton County | Orange | 299 | |
| Totals | | | | 22256 | 2.93% |
| 018 | 4 | Grafton County | Lebanon city | 12568 | |
| Totals | | | | 12568 | 1.72% |
| 019 | 2 | Sullivan County | Cornish | 1661 | |
| | | Sullivan County | Grantham | 2167 | |
| | | Sullivan County | Plainfield | 2241 | |
| Totals | | | | 6069 | -1.76% |
| 020 | 3 | Sullivan County | Croydon | 661 | |
| | | Sullivan County | Goshen | 741 | |
| | | Sullivan County | Newport | 6269 | |
| | | Sullivan County | Springfield | 945 | |
| | | Sullivan County | Washington | 895 | |

174

| DISTRICT | SEATS | COUNTY | TOWNSHIP/WARD | PERSONS | DEVIATION |
|---|---|---|---|---|---|
| Totals | | | | 9511 | 2.63% |
| 021 | 1 | Sullivan County | Sunapee | 3055 | |
| Totals | | | | 3055 | -1.10% |
| 022 | 5 | Sullivan County | Claremont city | 13151 | |
| | | Sullivan County | Lempster | 971 | |
| | | Sullivan County | Unity | 1530 | |
| Totals | | | | 15652 | 1.34% |
| 023 | 2 | Sullivan County | Acworth | 836 | |
| | | Sullivan County | Charlestown | 4749 | |
| | | Sullivan County | Langdon | 586 | |
| Totals | | | | 6171 | -0.11% |
| 024 | 4 | Cheshire County | Alstead | 1944 | |
| | | Cheshire County | Gilsum | 777 | |
| | | Cheshire County | Marlow | 747 | |
| | | Cheshire County | Nelson | 634 | |
| | | Cheshire County | Roxbury | 237 | |
| | | Cheshire County | Stoddard | 928 | |
| | | Cheshire County | Sullivan | 746 | |
| | | Cheshire County | Surry | 673 | |
| | | Cheshire County | Walpole | 3594 | |
| | | Cheshire County | Westmoreland | 1747 | |
| Totals | | | | 12027 | -2.66% |
| 025 | 7 | Cheshire County | Keene city | 22563 | |
| Totals | | | | 22563 | 4.35% |
| 026 | 5 | Cheshire County | Chesterfield | 3542 | |
| | | Cheshire County | Fitzwilliam | 2141 | |
| | | Cheshire County | Hinsdale | 4082 | |
| | | Cheshire County | Richmond | 1077 | |
| | | Cheshire County | Winchester | 4144 | |
| Totals | | | | 4144 | -2.97% |
| 027 | 4 | Cheshire County | Harrisville | 1075 | |
| | | Cheshire County | Marlborough | 2009 | |
| | | Cheshire County | Swanzey | 6800 | |
| | | Cheshire County | Troy | 1962 | |
| Totals | | | | 11846 | -4.13% |
| 028 | 4 | Cheshire County | Dublin | 1476 | |
| | | Cheshire County | Jaffrey | 5476 | |
| | | Cheshire County | Rindge | 5451 | |
| Totals | | | | 12403 | 0.38% |

State of New Hampshire
House Districts
Supreme Court Plan 2002
Full Geography Report

| DISTRICT | SEATS | COUNTY | TOWNSHIP/WARD | PERSONS | DEVIATION |
|----------|-------|--------|---------------|---------|-----------|
| 029 | 3. | Belknap County | Center Harbor | 996 | |
| | | Belknap County | New Hampton | 1950 | |
| | | Belknap County | Sanbornton | 2581 | |
| | | Belknap County | Tilton | 3477 | |
| Totals | | | | 9004 | -2.84% |
| 030 | 7 | Belknap County | Laconia city | 16411 | |
| | | Belknap County | Meredith | 5943 | |
| Totals | | | | 22354 | 3.38% |
| 031 | 8 | Belknap County | Alton | 4502 | |
| | | Belknap County | Barnstead | 3886 | |
| | | Belknap County | Belmont | 6716 | |
| | | Belknap County | Gilford | 6803 | |
| | | Belknap County | Gilmanton | 3060 | |
| Totals | | | | 24967 | 1.03% |
| 032 | 2 | Merrimack County | Danbury | 1071 | |
| | | Merrimack County | New London | 4116 | |
| | | Merrimack County | Wilmot | 1144 | |
| Totals | | | | 6331 | 2.48% |
| 033 | 3 | Merrimack County | Franklin city | 8405 | |
| | | Merrimack County | Hill | 992 | |
| Totals | | | | 9397 | 1.40% |
| 034 | 6 | Merrimack County | Bradford | 1454 | |
| | | Merrimack County | Henniker | 4433 | |
| | | Merrimack County | Hopkinton | 5399 | |
| | | Merrimack County | Newbury | 1702 | |
| | | Merrimack County | Sutton | 1544 | |
| | | Merrimack County | Warner | 2760 | |
| | | Merrimack County | Webster | 1579 | |
| Totals | | | | 18871 | 1.82% |
| 035 | 6 | Merrimack County | Andover | 2109 | |
| | | Merrimack County | Boscawen | 3672 | |
| | | Merrimack County | Canterbury | 1979 | |
| | | Merrimack County | Loudon | 4481 | |
| | | Merrimack County | Northfield | 4548 | |
| | | Merrimack County | Salisbury | 1137 | |
| Totals | | | | 17926 | -3.28% |
| 036 | 3 | Merrimack County | Chichester | 2236 | |
| | | Merrimack County | Pembroke | 6897 | |
| Totals | | | | 9133 | -1.45% |
| 037 | 8 | Merrimack County | Allenstown | 4843 | |

State·of New·Hampshire
House Districts
Supreme Court Plan 2002
Full Geography Report

| DISTRICT | SEATS | COUNTY | TOWNSHIP/WARD | PERSONS | DEVIATION |
|----------|-------|--------|---------------|---------|-----------|
| | | Merrimack County | Epsom | 4021 | |
| | | Merrimack County | Hooksett | 11721 | |
| | | Merrimack County | Pittsfield | 3931 | |
| **Totals** | : | | · | **24516** | **-0.79%** |
| 038 | 4 | Merrimack County | Concord Ward 01 | 4191 | |
| | | Merrimack County | Concord Ward 02 | 4175 | |
| | | Merrimack County | Concord Ward 03 | 4228 | |
| **Totals** | | | | **12594** | **1.93%** |
| 039 | 5 | Merrimack County | Concord Ward 04 | 3907 | |
| | | Merrimack County | Concord Ward 08 | 4029 | |
| | | Merrimack County | Concord Ward 09 | 3967 | |
| | | Merrimack County | Concord Ward 10 | 4159 | |
| **Totals** | | | | **16062** | **3.99%** |
| 040 | 4 | Merrimack County | Concord Ward 05 | 4210 | |
| | | Merrimack County | Concord Ward 06 | 3871 | |
| | | Merrimack County | Concord Ward 07 | 3950 | |
| **Totals** | | · | | **12031** | **-2.63%** |
| 041 | 3 | Merrimack County | Bow | 7138 | |
| | | Merrimack County | Dunbarton | 2226 | |
| **Totals** | | | · | **9364** | **1.05%** |
| 042 | 3 | Hillsborough County | Antrim | 2449 | |
| | | Hillsborough County | Hancock | 1739 | |
| | | Hillsborough County | Hillsborough | 4928 | |
| | | Hillsborough County | Windsor | 201 | |
| **Totals** | | | | **9317** | **0.54%** |
| 043 | 2 | Hillsborough County | Bennington | 1401 | |
| | | Hillsborough County | Deering | 1875 | |
| | | Hillsborough County | Francestown | 1480 | |
| | | Hillsborough County | Greenfield | 1657 | |
| **Totals** | | | · | **6413** | **3.80%** |
| 044 | 4 | Hillsborough County | Greenville | 2224 | |
| | | Hillsborough County | New Ipswich | 4289 | |
| | | Hillsborough County | Peterborough | 5883 | |
| | | Hillsborough County | Sharon | 360 | |
| **Totals** | | | | **12756** | **3.24%** |
| 045 | 4 | Hillsborough County | Lyndeborough | 1585 | |
| | | Hillsborough County | Mont Vernon | 2034 | |
| | | Hillsborough County | New Boston | 4138 | |
| | | Hillsborough County | Temple | 1297 | |
| | | Hillsborough County | Wilton | 3743 | |

State of.New Hampshire
House Districts
Supreme Court Plan 2002
Full Geography Report

| DISTRICT | SEATS | COUNTY | TOWNSHIP/WARD | PERSONS | Deviation |
|---|---|---|---|---|---|
| Totals | | | | 12797 | 3.57% |
| 046 | 4 | Hillsborough County | Brookline | 4181 | |
| | | Hillsborough County | Hollis | 7015 | |
| | | Hillsborough County | Mason | 1147 | |
| Totals | | | | 12343 | -0.11% |
| 047 | 8 | Hillsborough County | Amherst | 10769 | |
| | | Hillsborough County | Milford | 13535 | |
| Totals | | | | 24304 | -1.65% |
| 048 | 8 | Hillsborough County | Goffstown | 16929 | |
| | | Hillsborough County | Weare | 7776 | |
| Totals | | | | 24705 | -0.03% |
| 049 | 6 | Hillsborough County | Manchester Ward 01 | 9033 | |
| | | Hillsborough County | Manchester Ward 12 | 8679 | |
| Totals | | | | 17712 | -4.44% |
| 050 | 11 | Hillsborough County | Manchester Ward 02 | 9073 | |
| | | Hillsborough County | Manchester Ward 03 | 9013 | |
| | | Hillsborough County | Manchester Ward 10 | 8715 | |
| | | Hillsborough County | Manchester Ward 11 | 8708 | |
| Totals | | | | 35509 | 4.50% |
| 051 | 3 | Hillsborough County | Manchester Ward 04 | 8900 | |
| Totals | | | | 8900 | -3.96% |
| 052 | 3 | Hillsborough County | Manchester Ward 05 | 9070 | |
| Totals | | | | 9070 | -2.13% |
| 053 | 3 | Hillsborough County | Manchester Ward 07 | 9070 | |
| Totals | | | | 9070 | -2.13% |
| 054 | 3 | Hillsborough County | Manchester Ward 06 | 8978 | |
| Totals | | | | 8978 | -3.12% |
| 055 | 3 | Hillsborough County | Manchester Ward 09 | 8846 | |
| Totals | | | | 8846 | -4.54% |
| 056 | 3 | Hillsborough County | Manchester Ward 08 | 8921 | |
| Totals | | | | 8921 | -3.73% |
| 057 | 6 | Hillsborough County | Bedford | 18274 | |

178

| DISTRICT | SEATS | COUNTY | TOWNSHIP/WARD | PERSONS | Deviation |
|---|---|---|---|---|---|
| Totals | | | | 18274 | -1.40% |
| 058 | 11 | Hillsborough County | Litchfield | 7360 | |
| | | Hillsborough County | Merrimack | 25119 | |
| Totals | | | | 32479 | -4.41% |
| 059 | 3 | Hillsborough County | Nashua Ward 02 | 9704 | |
| Totals | | | | 9704 | 4.72% |
| 060 | 3 | Hillsborough County | Nashua Ward 03 | 9698 | |
| Totals | | | | 9698 | 4.65% |
| 061 | 3 | Hillsborough County | Nashua Ward 01 | 9551 | |
| Totals | | | | 9551 | 3.06% |
| 062 | 6 | Hillsborough County | Nashua Ward 04 | 9943 | |
| | | Hillsborough County | Nashua Ward 06 | 9252 | |
| Totals | | | | 19195 | 3.57% |
| 063 | 3 | Hillsborough County | Nashua Ward 05 | 9625 | |
| Totals | | | | 9625 | 3.86% |
| 064 | 3 | Hillsborough County | Nashua Ward 09 | 9578 | |
| Totals | | | | 9578 | 0.00% |
| 065 | 6 | Hillsborough County | Nashua Ward 07 | 7438 | |
| | | Hillsborough County | Nashua Ward 08 | 11816 | |
| Totals | | | | 19254 | 3.88% |
| 066 | 11 | Hillsborough County | Hudson | 22928 | |
| | | Hillsborough County | Pelham | 10914 | |
| Totals | | | | 33842 | -0.40% |
| 067 | 14 | Strafford County | Rochester city | 28461 | |
| | | Strafford County | Rollinsford | 2648 | |
| | | Strafford County | Somersworth city | 11477 | |
| Totals | | | | 42586 | -1.53% |
| 068 | 8 | Strafford County | Barrington | 7475 | |
| | | Strafford County | Farmington | 5774 | |
| | | Strafford County | Middleton | 1440 | |
| | | Strafford County | Milton | 3910 | |
| | | Strafford County | New Durham | 2220 | |
| | | Strafford County | Strafford | 3626 | |

State of New Hampshire
House Districts
Supreme Court Plan 2002
Full Geography Report

| DISTRICT | SEATS | COUNTY | TOWNSHIP/WARD | PERSONS | Deviation |
|----------|-------|--------|---------------|---------|-----------|
| Totals | | | | 24445 | -1.08% |
| | | | | | |
| 069 | 3 | Strafford County | Dover Ward 05 | 4492 | |
| | | Strafford County | Dover Ward 06 | 4504 | |
| Totals | | | | 8996 | -2.92% |
| | | | | | |
| 070 | 3 | Strafford County | Dover Ward 01 | 4542 | |
| | | Strafford County | Dover Ward 02 | 4456 | |
| Totals | | | | 8998 | -2.90% |
| | | | | | |
| 071 | 3 | Strafford County | Dover Ward 03 | 4411 | |
| | | Strafford County | Dover Ward 04 | 4479 | |
| Totals | | | | 8890 | -4.07% |
| | | | | | |
| 072 | 6 | Strafford County | Durham | 12664 | |
| | | Strafford County | Lee | 4145 | |
| | | Strafford County | Madbury | 1509 | |
| Totals | | | | 18318 | -1.17% |
| | | | | | |
| 073 | 5 | Rockingham County | Candia | 3911 | |
| | | Rockingham County | Deerfield | 3678 | |
| | | Rockingham County | Northwood | 3640 | |
| | | Rockingham County | Nottingham | 3701 | |
| Totals | | | | 14930 | -3.33% |
| | | | | | |
| 074 | 3 | Rockingham County | Raymond | 9674 | |
| Totals | | | | 9674 | 4.39% |
| | | | | | |
| 075 | 9 | Rockingham County | Auburn | 4682 | |
| | | Rockingham County | Londonderry | 23236 | |
| Totals | | | | 27918 | 0.42% |
| | | | | | |
| 076 | 13 | Rockingham County | Salem | 28112 | |
| | | Rockingham County | Windham | 10709 | |
| Totals | | | | 38821 | -3.33% |
| | | | | | |
| 077 | 11 | Rockingham County | Derry | 34021 | |
| Totals | | | | 34021 | 0.12% |
| | | | | | |
| 078 | 2 | Rockingham County | Atkinson | 6178 | |
| Totals | | | | 6178 | 0.00% |
| | | | | | |
| 079 | 11 | Rockingham County | Chester | 3792 | |
| | | Rockingham County | Danville | 4023 | |
| | | Rockingham County | Hampstead | 8297 | |
| | | Rockingham County | Kingston | 5862 | |

State of New Hampshire
House Districts
Supreme Court Plan 2002
Full Geography Report

| DISTRICT | SEATS | COUNTY | TOWNSHIP/WARD | TAPERSONS | Deviation |
|----------|-------|--------|---------------|-----------|-----------|
| | | Rockingham County | Plaistow | 7747 | |
| | | Rockingham County | Sandown | 5143 | |
| Totals | | | | 34864 | 2.60% |
| 080 | 4 | Rockingham County | Brentwood | 3197 | |
| | | Rockingham County | Epping | 5476 | |
| | | Rockingham County | Fremont | 3510 | |
| Totals | | | | 12183 | -1.40% |
| 081 | 2 | Rockingham County | East Kingston | 1784 | |
| | | Rockingham County | Newton | 4289 | |
| Totals | | | | 6073 | -1.70% |
| 082 | 3 | Rockingham County | Newfields | 1551 | |
| | | Rockingham County | Newmarket | 8027 | |
| Totals | | | | 9578 | 3.36% |
| 083 | 8 | Rockingham County | Exeter | 14058 | |
| | | Rockingham County | North Hampton | 4259 | |
| | | Rockingham County | Stratham | 6355 | |
| Totals | | | | 24672 | -0.16% |
| 084 | 4 | Rockingham County | Hampton Falls | 1880 | |
| | | Rockingham County | Kensington | 1893 | |
| | | Rockingham County | Seabrook | 7934 | |
| | | Rockingham County | South Hampton | 844 | |
| Totals | | | | 12551 | 1.58% |
| 085 | 5 | Rockingham County | Hampton | 14937 | |
| Totals | | | | 14937 | -3.29% |
| 086 | 7 | Rockingham County | Newington | 775 | |
| | | Rockingham County | Portsmouth city | 20784 | |
| Totals | | | | 21559 | -0.30% |
| 087 | 1 | Rockingham County | Greenland | 3208 | |
| Totals | | | | 3208 | 3.85% |
| 088 | 2 | Rockingham County | County subdivisions not defined | 0 | |
| | | Rockingham County | New Castle | 1010 | |
| | | Rockingham County | Rye | 5182 | |
| Totals | | | | 6192 | 0.23% |

[The following orders were issued by the supreme
court in *Burling v. Speaker of the House*; they are
reprinted here to provide context for the court's opinion.]

### Order Dated May 2, 2002

At the oral argument held this date on the motion to dismiss filed by the Speaker of the House, counsel for the Speaker effectively withdrew the motion to dismiss and conceded that the current house districts are not consistent with constitutional requirements. This court will not permit upcoming elections to go forward with unconstitutional districts.

Given today's proceedings, the briefing and oral argument schedule set forth in this court's order dated April 18, 2002, is unnecessary and is hereby vacated.

Because the June 5th filing date is imminent, the court will issue appropriate orders on or after Friday, May 17, 2002, at 12:00 noon, unless a house reapportionment plan has become law by that time. *See Monier v. Gallen*, 122 N.H. 474, 476 (1982).

Brock, C.J., and Nadeau, Dalianis and Duggan, JJ., concurred.

### Order Dated May 17, 2002

The parties having failed to notify the court by 12:00 noon today that a house reapportionment plan has become law, it is hereby ordered that the statutory filing period for house candidates is enjoined pending further order of the court. *See* RSA 655:14.

Based upon pleadings filed and representations made, the court has determined that May 22, 2002, is the last date by which the court will have assurance that a house reapportionment plan will be validly enacted in time for the upcoming election. *See Wilson v. Eu*, 823 P.2d 545, 547 (Cal. 1992).

In order to guarantee that the citizens of New Hampshire have the opportunity to vote for representatives in a constitutional election, the court will issue an order on or after May 23, 2002, outlining the process and schedule by which the court will establish a constitutional house reapportionment plan.

The parties should be mindful that the United States Supreme Court has said that when a court is compelled to resolve a legislative impasse and adopt a reapportionment plan for the citizens, the court-ordered plan "must ordinarily achieve the goal of population equality with little more than *de minimis* variation." *Chapman v. Meier*, 420 U.S. 1, 26-27 (1975); *see Colleton County Council, et al. v. Glenn F. McConnell, et al.*, No. 01-

3581-10 (D.S.C. Mar. 20, 2002) (interpreted *de minimus* variation as plus or minus one percent).

Several motions, including motions to intervene and to appear as *amicus curiae*, are pending. We will take no action on these motions at this time.

Brock, C.J., and Nadeau, Dalianis and Duggan, JJ., concurred.

### Order Dated May 23, 2002

The legislature, having recessed without adopting a reapportionment plan for the 2002 elections, has failed to comply with Part II, Article 9 of the New Hampshire Constitution. *See* order dated May 17, 2002. Therefore, in order to guarantee to the people of New Hampshire the "equal right to vote" provided by Part I, Article 11 of the New Hampshire Constitution and equal protection under the Fourteenth Amendment to the United States Constitution, the Court is constitutionally obligated to establish a reapportionment plan for the House of Representatives.

Henceforth, the parties to this case are: the petitioners, the Speaker of the House, the House of Representatives and the Secretary of State. It is the court's intention to permit each party to submit a written proposal for the court's consideration in devising its constitutional reapportionment plan. On Tuesday, May 28, 2002, the Court shall issue an order setting forth the requirements for written proposals and other materials to be filed with the Court. Proposals must be filed on or before 12:00 Noon on Thursday, June 6, 2002. The court intends, if necessary, to hear oral argument on the parties' proposals on June 11, 2002 at 10:00 a.m. before adopting the final reapportionment plan for the House. No request for a continuance will be entertained.

The court's primary consideration in adopting a reapportionment plan is that it satisfy the federal and state constitutional principle of one person/one vote. Accordingly, it intends to adopt a plan that as nearly as practicable achieves mathematical equality, consistent with a House of Representatives comprised of at least 375 but not more than 400 representatives as provided by Part II, Article 9. Therefore, it may not be possible to consider other factors such as geographical contiguity, community of interest or configuration of existing districts, or to give full effect to the constitutional provision relating to the division of towns, wards or places.

If a reapportionment plan is validly enacted before the Court adopts a plan, the court will terminate this proceeding.

The order issued on May 17, 2002 enjoining the June 5, 2002 filing date remains in effect but shall expire automatically if a validly enacted plan is adopted by 12:01 a.m. on June 5, 2002.

The Secretary of State shall inform the court in writing by 12:00 Noon Tuesday, May 28, 2002, of the time that he believes will be required to print and distribute ballots in advance of a 2002 primary election for the purpose of nominating candidates for the House of Representatives.

All non-budgeted costs incurred by the Court associated with this case, including but not limited to, computer program costs and the cost of one or more technical assistants shall be paid by the State Treasurer.

The motion for recusal filed by the Speaker of the House is denied. A written order will follow.

Brock, C.J., and Nadeau, Dalianis and Duggan, JJ., concurred.

### Order Dated May 24, 2002

The Speaker of the New Hampshire House of Representatives, Gene Chandler, has filed a motion for recusal of Chief Justice David Brock from participating in this case. The motion alleges that because eighteen months ago, the house of representatives voted in favor of four articles of impeachment against the chief justice, his impartiality in these proceedings "might reasonably be questioned," thereby necessitating his recusal. For the following reasons, the motion is denied.

The motion for recusal is untimely, having been filed thirty-six days after the filing of the appeal, SUP. CT. R. 21A, and with no good cause shown for failure to file a timely motion. *Id.* We choose, however, to address the motion on its merits, and we conclude that it fails.

It is presumed that a judge will not involve himself or herself in a proceeding in which he or she cannot be impartial. *See State v. Crockett,* 801 S.W.2d 712, 715 (Mo. Ct. App. 1990). Furthermore, it is not enough for a party to allege bias; rather, the party seeking disqualification of a judge must show some evidence of bias or prejudice. *See Brewton v. Kelly,* 166 So.2d 834, 836 (Fla. Dist. Ct. App. 1964) (affidavits were filed by individuals personally known by the judge, who were familiar with the impeachment proceedings, and believed the judge was prejudiced against the parties). Such a showing must be "clearly established by the record." *DeGrace v. DeGrace,* 520 A.2d 987, 989 (Vt. 1986) (quotations omitted).

No evidence has been offered to support the claim that the chief justice lacks impartiality in this matter. Throughout the impeachment proceedings, the chief justice participated in a manner respectful to the legislature's right to invoke such a process and respectful of those engaged in the process. The chief justice never testified during the proceedings

with rancor against any member of the house of representatives, nor does the motion present any evidence of ill will harbored by the chief justice against the house of representatives. A general allegation that legislative impeachment proceedings invoked against a judge should bar that judge from performing his or her constitutional responsibilities, absent clear evidence of bias or partiality, is unfounded.

In addition, we reject the argument that because the house of representatives voted in favor of articles of impeachment against the chief justice, his recusal in this unrelated matter is necessary to avoid an "appearance of bias." *See State v. Linsky,* 117 N.H. 866, 882 (1977). If this position were adopted, logic compels that if the judiciary acts in a manner adverse to the legislature, similarly the legislature would then be barred from participating in matters relating to the judiciary. Under this scenario, the governmental functions of the State would quickly become paralyzed. The nature of a democratic system requires that the co-equal branches of government at times conflict. Neither conflict, nor cooperation, should in such circumstances serve as the basis for disqualification.

We conclude that the motion has failed to establish "the existence of bias, or such likelihood of bias, or an appearance of bias that the judge is unable to hold the balance between vindicating the interests of the court and the interests of a party." *Blevens v. Town of Bow,* 146 N.H. 67, 70 (2001) (quotations omitted).

Brock, C.J., and Nadeau, Dalianis and Duggan, JJ., concurred.

### Order Dated May 30, 2002
The court has concluded that it is necessary to appoint a neutral, technical advisor to assist the court in this case. A technical advisor will provide assistance to the court in understanding and utilizing relevant technology and, thus, enable the court to fulfill, on an expedited basis, its constitutional responsibility to establish a reapportionment plan for the House of Representatives.

The court proposes to issue an order appointing Mr. Bobby Bowers, Director of the South Carolina Budget and Control Board Office of Research and Statistics, as its technical advisor in this case. Mr. Bowers has served in the capacity as a technical advisor to the United States District Court for South Carolina in redistricting litigation and has extensive experience in this area. *See Colleton County Council, et al. v. Glenn F. McConnell, et al.,* No. 01-3581-10 (D.S.C. Mar. 20, 2002); *Burton v. Sheheen,* 793 F. Supp. 1329, 1339 (D.S.C. 1992), *vacated sub nom., Statewide Reapportionment Advisory Committee v. Theodore,* 508 U.S.

968 (1993). Mr. Bowers' business address is Suite 425, Rembert C. Dennis Building, 1000 Assembly Street, Columbia, South Carolina 29201. A copy of Mr. Bowers' curriculum vitae is attached to this order.

In his capacity as technical advisor, Mr. Bowers may be called upon to assist the court in educating itself in the technical language of redistricting and mapping and in the technology employed by the parties and their technical experts; to act as a liaison, if necessary, between the court and the parties' technical experts to achieve an acceptable computer format; and to assist the court in understanding and analyzing the proposed redistricting plans which are expected to be submitted by the parties. Mr. Bowers will advise the court *in camera*, as requested, concerning any technical matters. To the extent necessary for resolution of this matter, Mr. Bowers may also be called upon to assist in drawing a redistricting plan for the court, but only in accordance with the directives of the court.

Courts have inherent authority to appoint technical advisors in rare cases in which outside technical expertise would be helpful. *See Reilly v. United States*, 863 F.2d 149, 156 (1st Cir. 1988). "[S]uch appointments should be the exception and not the rule, and should be reserved for truly extraordinary cases where the introduction of outside skills and expertise, not possessed by the judge, will hasten the just adjudication of a dispute without dislodging the delicate balance of the juristic role." *Id.* *See generally State v. Coon*, 974 P.2d 386, 395-96 (Alaska 1999) (discussing authority of courts to appoint expert technical advisors).

Throughout this proceeding, Mr. Bowers will act as a sounding board for the court's assessment of the plans submitted by the parties and will function as a confidential advisor to the court analogous to the role performed by the court's judicial clerks. He will be appointed only as a technical advisor to the court pursuant to the inherent authority of the court, *see Reilly*, 863 F.2d 149; he will not be appointed as an expert. Mr. Bowers will not be called upon to testify. He will not act as a finder of fact, nor will he attempt to advise the court on any matter of law. Neither he nor staff members acting at his direction may be subjected to cross-examination, and all confidential computer and other confidential files of Mr. Bowers and his staff prepared in connection with this case, like those of the court, shall be protected from demands for production or disclosure.

ACCORDINGLY, THE PARTIES ARE HEREBY NOTIFIED that the court intends to appoint Mr. Bobby Bowers, Director of the South Carolina Budget and Control Board Office of Research and Statistics, as its technical advisor in this case. If any party objects to the appointment of Mr. Bowers as technical advisor, that party shall file a written objection,

setting forth the specific grounds for the party's objection, on or before June 5, 2002.

Brock, C.J., and Nadeau, Dalianis and Duggan, JJ., concurred.

## Order Dated June 7, 2002

By order dated May 30, 2002, this court notified the parties of its intent to appoint Mr. Bobby Bowers, Director of the South Carolina Budget and Control Board Office of Research and Statistics, as its technical advisor in this case to assist the court in understanding and utilizing relevant technology to enable the court to fulfill on an expedited basis its constitutional responsibility to establish a reapportionment plan for the House of Representatives. It did so due to its firm conviction that this case is an "extraordinary [one] where the introduction of outside skills and expertise, not possessed by the judge, will hasten the just adjudication of a dispute without dislodging the delicate balance of the juristic role." *Reilly v. United States*, 863 F.2d 149, 156 (1st Cir. 1988). Mr. Bowers served as a technical advisor to the United States District Court for the District of South Carolina in a number of redistricting cases, *see Colleton County Council, et al v. Glenn F. McConnell, et al.*, No. 01-3581-10 (D.S.C. Mar. 20, 2002); *Burton v. Sheheen*, 793 F. Supp. 1329, 1339 (D.S.C. 1992), *vacated sub nom.*, *State Reapportionment Advisory Committee v. Theodore*, 508 U.S. 968 (1993), and he has extensive experience in this area.

The parties were ordered to advise the court in writing of any objections to the proposed appointment of Mr. Bowers, and the reasons therefore on or before June 5, 2002. To date, no such objection has been filed by any party to the court's proposed course of action.

ACCORDINGLY, the court hereby appoints Mr. Bobby Bowers, Director of the South Carolina Budget and Control Board Office of Research and Statistics, as its technical advisor in this cases. In his capacity as the court's technical advisor, Mr. Bowers will be called upon to assist the court in educating itself in the technical language of redistricting and mapping and in the technology employed by the parties and their technical experts; to act as a liaison, if necessary, between the court and the parties' technical experts; and to assist the court in understanding and analyzing the proposed redistricting plans submitted by the parties. Mr. Bowers will advise the court *in camera*, as requested, concerning any technical matters. To the extent necessary for resolution of this matter, Mr. Bowers may also be called upon to assist in drawing a redistricting plan for the court, but only in accordance with the directives of the court.

Throughout this litigation, Mr. Bowers will act as a sounding board for the court's assessment of the plans submitted by the parties and will function as a confidential advisor to the court analogous to the role performed by the court's judicial clerks. He is appointed only as a technical advisor to the court pursuant to the inherent discretion of the court, *see Reilly*, 863 F.2d 149; he is not appointed as an expert. He will not act as a finder of fact, nor will he attempt to advise the court on any matter of law. Neither he nor staff members acting at his direction may be subjected to cross-examination, and all confidential computer and other confidential files of Mr. Bowers and his staff prepared in connection with this case, like those of the court, shall be protected from demands for production or disclosure.

Brock, C.J., and Nadeau, Dalianis and Duggan, JJ., concurred.

### Order Dated June 26, 2002

Part II, Article 9 of the New Hampshire Constitution mandates that any apportionment plan for the New Hampshire House of Representatives be based upon "the last general census of the inhabitants of the state taken by authority of the United States or of this state." N.H. CONST. pt. II, art. 9; *see also McGovern v. Secretary of State*, 138 N.H. 128, 131 (1993); N.H. CONST. pt. II, art. 26 (regarding apportionment of senate). Accordingly, when the court issued an order on May 28, 2002 describing the criteria to which any redistricting plan submitted by the parties must conform, these criteria included the requirement that the plan use PL 94-171 census data and that it be provided as a census block equivalency file.

The Speaker of the House requested that the court modify its May 28, 2002 order to state that plans be based on ward lines drawn as a result of the 2000 federal census, rather than on census blocks. On June 4, 2002, the court modified its May 28, 2002 order to permit, but not require, parties to submit plans based on ward lines drawn as a result of the 2000 federal census. The court expressed no opinion as to whether any such plan would satisfy the federal and state constitutional principle of one person/one vote, or whether the court would adopt such a plan. The court invited the parties to address these issues in their pleadings and at the time of oral argument.

The court received the plans submitted by the parties on or before June 6, 2002. The plans submitted by the parties indicated that they were based upon ward boundaries drawn after the 2000 federal census was conducted. None of the plans submitted by the parties identified the ward boundaries changed after the 2000 census was conducted, the location of the new ward

boundaries, or the data from which the changed ward boundaries were derived.

Thus, on June 10, 2002, the court ordered the House of Representatives to provide to the court "in written and electronic form, the [census] block equivalency files showing ward changes made by any city based on the 2000 federal census figures." The House of Representative responded that it was unable to comply with this request before oral argument on June 11, 2002.

At oral argument, the court told the parties that "we need the [census] block equivalency files to show what census blocks were shifted from ward to ward . . . in order for us to construct a plan. . . . We just have to know what pieces of the census data have been changed as a result of these ward changes" and asked who had this information. To give the parties time to answer this question, the court recessed oral argument briefly. During the recess, the Clerk of Court asked counsel for the Secretary of State to provide the court with information about any ward boundary changes made after the 2000 census was conducted and, specifically, to identify the census blocks affected by the ward boundary changes. Counsel for the Secretary of State said that the Secretary of State did not have this information.

Following the recess, counsel for the House of Representatives informed the court that "only one city . . . uses census blocks [to change its ward boundaries], and that's Dover." Counsel further informed the court that while the cities of Manchester and Nashua had both changed their ward boundaries after the 2000 census was conducted, neither city used census block data to make these changes; both cities "used streets" to make changes to their ward boundaries.

Because our State Constitution requires that any apportionment plan be based upon the last federal decennial census, see N.H. CONST. pt. II, arts. 9, 11, 26, the court then informed the parties that "in the absence of the data, hearing that most of the cities haven't used the census data, and to expedite the process we're in, we're going to have to rely upon the unadjusted PL 94-171 census data for those wards."

Since oral argument, no party has provided the court with the requisite data. In the opinion the court issued on June 24, 2002, in case no. 2002-0243, *Petition of Senator Clifton Below & a.*, the court relied upon the unadjusted PL 94-171 census data for the entire State, including those cities that adjusted their ward boundaries after the 2000 census was conducted. The court stated that wherever changes to ward boundaries had been made after the 2000 census was conducted, "it will be the responsibility of the appropriate officials to conform the ward lines to the PL 94-171 data *or* to make internal election process accommodations."

(Emphasis added). For instance, RSA 656:1 (1996) makes the Secretary of State responsible for preparing and delivering the ballots for all State elections, which might include preparing and delivering separate ballots for voters in wards with changed boundaries.

In this case, the court also intends to use the PL 94-171 census data, and to rely upon the ward boundaries submitted to the United States Census Bureau for the 2000 census instead of upon the ward boundaries that changed after the 2000 census was conducted. It will again "be the responsibility of the appropriate officials to conform the ward lines to the PL 94-171 data or to make internal election process accommodations." *See* RSA 656:1.

Should the parties wish the court to consider, in this case, using ward boundaries that were changed after the 2000 census was conducted, they shall submit the following information to the court by 12:00 p.m. on Monday, July 1, 2002:

1.     A list of the cities that changed their ward boundaries after the State submitted ward boundaries to the United States Census Bureau to enable the 2000 federal decennial census to be conducted.

2.     Certified copies of the city charters of those cities that changed their ward boundaries after the ward boundaries were submitted to the United States Census Bureau for the 2000 census.

3.     The maps of the ward boundaries in cities that changed their boundaries after the ward boundaries were submitted to the United States Census Bureau for the 2000 census.

4.     An affidavit from the person responsible in each city that changed its ward boundaries after the ward boundaries were submitted to the United States Census Bureau for the 2000 census explaining how the changes to ward population were calculated (i.e., were census block equivalency files used and, if so, how were they used; if census block equivalency files were not used, how did they determine how many people lived in each portion of a ward, etc.)

5.     A stipulation, signed by all of the parties, indicating that the proposals submitted to the court relied upon ward boundaries that had been changed after the ward boundaries were submitted to the United States Census Bureau for the 2000 census.

6.     A brief memorandum addressing the issue of whether the State Constitution permits the court to adopt an apportionment plan that relies upon ward boundaries changed after the 2000 census was conducted, without using the census block equivalency files.

Brock, C.J., and Nadeau and Dalianis, JJ., concurred.

## Order Dated September 23, 2002

On May 23, 2002, the court issued orders in the above captioned cases requiring that "All non-budgeted costs incurred by the Court associated with this case, including but not limited to, computer program costs and the cost of one or more technical assistants shall be paid by the State Treasurer." On May 28, the Commissioner of the Department of Treasury, through the Attorney General's Office, filed a Motion to Clarify this order. A Joint Memorandum in Support of the State Treasurer's Motion for Clarification and Joint Request for Modification of the Court's order of May 23, 2002 was filed by the Governor, Senate and House of Representatives. On May 30, the Court issued an order indicating its intention to appoint Bobby Bowers as its technical advisor and affording all parties an opportunity to object to the appointment. Only the Senate President filed an objection. On June 7, the Court issued orders in these cases appointing Bobby Bowers as its technical assistant.

That same day the Court issued a clarification and modification of the May 23 order. In the order the court indicated that it found itself faced with the responsibility of developing redistricting plans that satisfied the constitutional mandate. It advised the parties that the court would continue to incur unanticipated expenses that were not provided for in its budget, including the expense of technical advisors to assist the court. The order provided in part:

> These are expenses incurred to benefit the citizens of the State and it was the court's intention by its order of May 23, 2002, to inform the parties of its expectation that the State would be responsible for their payment. . . . The court requests the parties to file memoranda and address at oral argument the issue of how these unanticipated expenses should be paid.

Oral argument in both cases was held four days later. The issue of payment of the expenses for the technical advisors was addressed briefly at argument. None of the parties, however, filed memoranda requested by the June 7 order.

At this point, the bill for the technical advisors has been received, but has not been paid. Various alternatives may be available for its payment, including whether the bill is chargeable to one or more of the parties in these cases.

The Court has concluded it would be useful for counsel for the parties in these cases to meet with the clerk to discuss how this bill will be paid and whether this matter can be resolved without further briefing, argument or court order. A conference with the clerk has been scheduled for Monday,

October 7, 2002, at 9:30 a.m. at the Supreme Court. Counsel for all parties shall attend.

Brock, C.J., and Nadeau, Dalianis, and Duggan, JJ., concurred.

### Order dated October 9, 2002

During the course of these cases, the issue arose of how unanticipated expenses related to these cases would be paid, and who was responsible for payment. The court first addressed the issue in its orders of May 23, 2002, which stated in part: "All non-budgeted costs incurred by the Court associated with this case, including but not limited to, computer program costs and the cost of one or more technical assistants shall be paid by the State Treasurer."

On May 28, the Commissioner of the Department of Treasury, through the Attorney General's Office, filed a Motion to Clarify these orders. A Joint Memorandum in Support of the State Treasurer's Motion for Clarification and Joint Request for Modification of the Court's order of May 23, 2002, was filed by the Governor, Senate and House of Representatives.

On May 30, the Court issued orders indicating its intention to appoint Bobby Bowers as its technical advisor, and on June 7, it issued orders doing so.

On June 7, the court also issued orders clarifying and modifying its May 23 orders relating to these expenses. Noting that it would continue to incur unanticipated and unbudgeted expenses in fulfilling its responsibility to develop redistricting plans for the House and the Senate, the court stated:

> These are expenses incurred to benefit the citizens of the State and it was the court's intention by its order of May 23, 2002, to inform the parties of its expectation that the State would be responsible for their payment. . . . The court requests the parties to file memoranda and address at oral argument the issue of how these unanticipated expenses should be paid.

None of the parties filed the requested memoranda. Oral argument in both cases was held four days later. The issue of payment of the court's expenses was addressed by some of the parties at argument. When asked about payment of the court's expenses related to the redistricting cases, counsel for the Senate President stated:

> [P]resident Klemm wanted you to know that he has worked successfully with the court on the question of the legislative audit and the additional funding for the district courts and has no reason to believe we couldn't resolve this. . . . We have to meet

with other people in State Government to do that. *But he's optimistic that we can come up with something that will work for all three branches.* (Emphasis added.)

When asked about payment of the court's expenses, counsel for the House of Representatives stated:

I think I have an answer similar to [counsel for the Senate President]. We received that late and we're more than willing to talk about it. We also think that the Governor's an appropriate party to be involved in that discussion. *But that we're more than willing to discuss it and to come to some sort of agreement.* (Emphasis added.)

The court received the bill of the technical advisor hired by the court for services rendered in these cases. A copy of the bill has been provided to the parties in these cases. The bill also was sent to the General Court Fiscal Committee, which indicated that it had no authority to pay the bill.

By order dated September 23, 2002, the court ordered that a structuring conference be held by the clerk of court "to discuss how this bill will be paid and whether this matter can be resolved without further briefing, argument or court order." The structuring conference took place on October 7, 2002, but no agreement was reached by the parties about payment of this bill.

Accordingly, on or before 12:00 noon, October 18, 2002, the petitioners in each case, the House of Representatives, the Senate, the Speaker of the House, and the President of the Senate shall file memoranda addressing the following issues: (1) which party or parties will be responsible for payment of the bill for services of the technical advisor; and (2) the amount which a responsible party shall pay. A hearing on these issues will be held at 10:30 a.m. on October 23, 2002, in 2002-0243, *Petition of Senator Clifton Below,* and at 11:00 a.m. on October 23, 2002, in 2002-0210, *Petition of Representative Peter Burling & a.* It is not necessary for the State Treasurer or the Secretary of State to file a memorandum or attend the hearing.

Brock, C.J., and Nadeau, Dalianis, and Duggan, JJ., concurred.

### Order dated October 29, 2002

At the October 23rd argument, all parties agreed that the court has the inherent power to engage the services of a technical advisor. The parties also agreed that the expense for the technical advisor is one the State of New Hampshire must pay and that if the advisor were forced to bring suit

on the contract to recover his fees, the State would be obligated to pay any judgment.

At argument, the court was informed that the advisor's bill can be paid from the following funds: $1,976,000 currently at the disposal of the Senate; $3,601,000 currently at the disposal of the House; and $1,125,000, of which $236,276 is a specific line item for "consultants," currently at the disposal of the Joint Facilities Committee. The court was also informed that the Speaker of the House, the Senate President or the Joint Facilities Committee can authorize payment from these funds without additional action by the legislature.

Accordingly, the court will defer taking any further action in this case for a period of 14 days. The court requests that counsel provide the attached transcript of the October 23rd oral arguments to the House and Senate leadership and members of the Joint Facilities Committee. It is the court's hope that the elected representatives of the people will decide that voluntary payment of the bill from the accounts described above serves a legitimate purpose which advances the best interest of the people and the government.

Brock, C.J., and Nadeau, Dalianis, and Duggan, JJ., concurred.

## TRANSCRIPT OF THE ARGUMENTS BEFORE THE NEW HAMPSHIRE SUPREME COURT ON OCTOBER 23, 2002

APPEARANCES: John P. Kacavas, Esq.
for the petitioners in Case No. 2002-0243

Richard J. Lehmann, Esq.
for the New Hampshire Senate

Charles G. Douglas, III, Esq.
for the President of the New Hampshire Senate

Michael D. Hatem, Esq.
for the petitioners in Case No. 2002-0210

Representative Peter H. Burling

Betsy B. Miller, Esq.
for the New Hampshire House of Representatives

Christopher H.M. Carter, Esq.
for the Speaker of the New Hampshire House of Representatives

CHIEF JUSTICE BROCK: The matter is before the court this morning on the petition of Below (#2002-0243) and the petition of Burling (#2002-0210). Mr. Kacavas.

ATTORNEY KACAVAS: Thank you, Your Honor. Good morning, Your Honors. May it please the court, my name is John Kacavas and I appear on behalf of the petitioners to reiterate the position that we took when we were last here at the oral argument on the redistricting matter and that position is that because the legislature abdicated its responsibility to constitutionally enact valid legislative districts, the legislature bears responsibility for paying the costs and fees incurred by the court in standing in the legislature's stead. Before I go any further, Your Honor, because both these arguments for all intents and purposes are one consolidated argument, because the petitioner on the Senate case, the position of the petitioners in the Senate in entirely consonant with the position of the petitioners in the House matter and Representative Peter Burling, the named petitioner in the House matter, is here with me today. Representative Burling has the most up-to-date, as of this morning, information regarding the legislative accounts from which these costs and fees could be paid. I would ask the court in the interest in putting the cart before the horse to — for leave to yield a portion of my time so that Representative Burling can inform the court about his findings about the legislative accounts. I have made my proposal to opposing counsel who objects, for the court's information.

CHIEF JUSTICE BROCK: All right. May we hear the basis of the objection?

ATTORNEY LEHMANN: Yes, Your Honor. The basis of the objection is simply that we came here this morning not prepared to discuss in any detail the workings of the legislative budget process. We're — this is a complete surprise to us and additionally Representative Burling is not a party to this case, in either event. I agree that the issues are fundamentally the same, but that's the basis of our objection.

CHIEF JUSTICE BROCK: Well, didn't the parties — the Senate and the House file a joint memorandum in these cases?

ATTORNEY LEHMANN: That's correct. Yes.

CHIEF JUSTICE BROCK: So I think that there is a recognition that these cases overlap.

ATTORNEY LEHMANN: Absolutely, I don't contest that that's the case.

CHIEF JUSTICE BROCK: And you're saying that you didn't understand that one of the purposes of this hearing was for us to inquire as to how this bill could be paid.

(PAUSE)

ATTORNEY LEHMANN: Well, my understanding is that the court's order was to answer the question, "Which party will pay it?" Not, what the — where the money could be found if we looked in every possible location. The legislature's not here saying that we're — its not able to pay the bill if the court issues an order, the money exists, that's not the issue.

(PAUSE)

CHIEF JUSTICE BROCK: All right, do you wish to be heard Mr. Kacavas?

ATTORNEY KACAVAS: I do, Your Honor. First of all, Your Honor, Representative Burling is a party in this matter, he's the named petitioner in this matter and as counsel just conceded these matters overlap and on the issue of payment, they are identical. We are here to present the court with an argument and reasoning as to why we believe the legislature should bear the responsibility to pay the costs for the court's technical advisor. In order to do that we need to establish for the court where these funds are coming from, how much is available and other funds that have been paid on behalf of legal counsel to the respondents in this matter. And, I think it's important for the court to kind of set the table and then permit us to argue. And, that's why I ask that the court permit Representative Burling to provide the court with some information that I think will inform the rest of our discussion.

CHIEF JUSTICE BROCK: Mr. Douglas would you like to be heard?

ATTORNEY DOUGLAS: Well, I would object too, Your Honor. What is going to happen is something that should have — be in front of a master. You're going to hear a lot of line item discussion of the details of the budgeting. I see from the handouts that they've given us, pages of numbers and I'm just not sure this court is the appropriate place to fact find on what line items are where. Mr. Burling is in the legislature, but we don't have folks here from the LBA's office or the legislative facilities office to respond to line item issues. I thought we were here, like in most Supreme Court arguments, on legal arguments, constitutional arguments. Now it's going to turn out that if the money is in line 43 under this code you can move it here. All that maybe true, in a cosmic sense, but it still doesn't answer the question of who should pay and who's responsible. So,

we just object to that process. If John wants to make his legal argument and our team, ours, fine. And, if the court afterwards says well, this does require somebody to just take an afternoon and haul the right people in to figure out these line items that's fine. But, frankly, to be given this this morning, it was not provided previously, memos — there was a deadline — memos were provided. This morning, we're handed a series of numbers and legislative codes. I think that's improper. That's not how I've ever argued a case before.

CHIEF JUSTICE BROCK: All right, Mr. Kacavas, are you representing to the court that the information that Mr. Burling would give us in a preliminary manner is consistent with the affidavit that he filed and would be helpful to the court's ultimate resolution of this matter?

ATTORNEY KACAVAS: I am, Your Honor, and in addition to that, in response to Attorney Douglas' comment, our position on this issue is no surprise. We took this position at the oral argument on the substantive issue of redistricting, we've taken this position in filing our memorandum last week. Our position in this case is no surprise. What we are here to do is to inform the court, provide the court with information and that is exactly what we propose to do, Your Honor.

CHIEF JUSTICE BROCK: All right, we're going to grant the motion. But, if it becomes necessary for the House or the Senate to present additional information to the court, we will consider giving them that opportunity to do that this afternoon.

ATTORNEY KACAVAS: And we certainly would have no objection to that Your Honor.

CHIEF JUSTICE BROCK: All right, we're going to allow Mr. Burling to make his presentation and we'd like to start the clock fresh at this point.

REP. PETER BURLING: Thank you, Your Honors. For the record, my name is Peter Hoe Burling. I represent the towns of Cornish and Plainfield and I'm the Democratic leader of the New Hampshire House. I'll move very quickly through the points I wanted to make. I'm here, I hope, to assist the court in understanding the current status of events. I stood here before this honorable bench on May 23rd and at the conclusion of some remarks, if I remember correctly, being made by Representative John Pratt, I was asked by one of the Justices what my position was as the Democratic leader relative to paying the bills incident to a redistricting case. I stood here and said that it was my position that these were legislative obligations and that the costs should be borne by the legislature. I remember the same question being directed to counsel on my

left and, I want to be very clear, I do not remember that any objection was raised at the time by House counsel. I'm informed that Senate counsel had filed a written objection. But, I do clearly remember the statement being made to the bench, "I'm sure we can work this out, Your Honors." That's the last I heard of the whole issue. And, I should say that I understood that the court would hire experts and would proceed to incur expenses in the redistricting matter, if the legislature was unable to pass a constitutional plan. The next thing that happens, following the issuance of the court's order, is a finance — excuse me — a fiscal committee meeting of the legislature on the 31st of July. I mention this just by context. At that meeting, the legislative — joint legislative fiscal committee approved the payment of a large number of redistricting costs. Included in the redistricting costs, though not specified on the 31st, were legal fees for the Senate President's counsel and the House Speaker's counsel.

CHIEF JUSTICE BROCK: May I interrupt. Did you say the fiscal committee approved this?

REP. BURLING: Joint Legislative Fiscal Committee approved this.

CHIEF JUSTICE BROCK: All right.

REP. BURLING: I'm not a member of that committee, so I wasn't present. But, I learned subsequently from the Democrat who was present that this had happened. I also learned that she had asked for a specification of charges included in that July 31st vote and that specification of charges was provided by Michael L. Buckley, CPA. He's the legislative budget authority. That was provided to us on September 9, 2002, and I have a copy for Your Honors should you deem it to be appropriate and helpful.

CHIEF JUSTICE BROCK: We would like you to leave a copy with the stenographer.

REP. BURLING: I'd be happy to do so, Your Honor. The question about paying for the necessary costs incurred by the court obviously became an issue in September and I would simply like to say that my position and that of my caucus remains the same. We believe this is a legislative obligation. More specifically, as I said in my affidavit, we believe that it is perfectly appropriate for the court to apportion the expense on the basis of the work that Mr. Bowers said he did. I have no reason to disbelieve and I do not disbelieve his allocation of hours between the Senate and the House. And, for my part and my caucus, I would say to the court, I think it's entirely appropriate for the House to be charged proportionate to the hours incurred. The final thing I would like to do is I

would say simply that as a legislator and a citizen of the U — State of New Hampshire, I'm entitled to review public documents relative to legislative accounts. I did so this morning and I would simply like to say, and again I have a copy of this for the court, that under the line item Joint Legislative Account — Consultants, that is, the number becomes apparent, but it's 1160 Subsection 046, there is a current balance in the possession of the Joint Legislative Body of $236,276.37. I would represent to the court that on the basis of what I've heard that is more than sufficient to cover the ordinary and necessary expenses incurred by Mr. Bowers doing what was a legislative function on behalf of the court. Finally, I would simply like to say as Democratic leader that I believe that this matter falls clearly within the power of the court to order payment and while I am painfully aware of the constraints this is placing upon the court you will have my support, for what its worth, if you issue an order directing payment and I would like to say as a legislator that I am ashamed and saddened that the chance should be taken to place the court between a rock and a hard place on this issue. We all knew when we came here that we were here because we could not politically resolve the most difficult of problems and even though there were parts of the redistricting order that made me sit down hard on the concrete, I knew at every stage of this process that it was a legislative obligation and that we owed the duty to pay. Thank you for your attention.

JUSTICE DUGGAN: May I ask a question. The line that you mentioned, Joint Legislative Accounts line, who is — under what process is that spent? Is that the Joint Legislative Fiscal Committee can authorize expenditures from that line?

REP. BURLING: Well, under my understanding of House Rules and Joint Rules, we don't currently have a joint rules, but traditions, lets put it that way, both the Legis — Joint Facilities Committee and the Joint Fiscal Committee should meet to approve these. But —

JUSTICE DUGGAN: But, the approv — I'm sorry go ahead.

REP. BURLING: But, the approval would be by the committee and in ordinary course of things, we would meet and we would say we've got a bill to pay, we'd all say yes and the bill would get paid out of the appropriate account.

JUSTICE DUGGAN: So, those two committees are authorized by whatever process to pay out of that line without any other legislative or executive action.

REP. BURLING: That's my understanding. And, Your Honor I want to be very clear, at the start of the process of redistricting we did, in fact,

appropriate a sum of money. That sum of money was to cover the costs, which we knew would be incurred in the redistricting process. When the re — when the majority party in joint fiscal decided to pay the legal bills on their side of the fight they did so without enough money in the account. So, they brought in money from other accounts to the redistricting accounts to cover their costs. That becomes apparent when you review this other document I'll make available to you. And that is, the definition by Mr. Buckley of what happened regarding redistricting expenses. So, they brought in $20,000 additional dollars to that account so they could cover the cost of their own counsel. There is, at least according to this record, a continuing balance in that account, but not enough to cover the $80,000 expenditure. The point is, it would take next to nothing in terms of legislative effort to get the money in the right place to pay the bill.

CHIEF JUSTICE BROCK: Are — is it required under the rules that there be a meeting of these two committees in order to approve transfers in these accounts and expenditures?

REP. BURLING: That has always been the rule.

CHIEF JUSTICE BROCK: And, do you know at this point whether there are minutes of these meetings?

REP. BURLING: The only things I have are the September 9, 2002 letter from Mr. Buckley, which detailed all of the items in the redistricting expense, which was paid on the 31st of July. And, in addition to that, I have this document, which is part of a regular monthly statement to the Joint Fiscal Committee of the State's financial situation and in specific the legislature's financial situation. And as I say, I believe these documents are public documents. I just walked down to Mr. Buckley's office this morning and asked for them.

JUSTICE DUGGAN: Can I ask you a couple more questions too? Can you give us a ballpark figure as to how much the legislature has paid out of this account for outside legal fees?

REP. BURLING: I'd be delighted to give you that figure. The specifics, I don't have an adding machine before me — I've got —

JUSTICE DUGGAN: Ballpark figure.

REP. BURLING: Ah, $9,300 to McLane; Douglas, Leonard and Garvey $15,000; Hinckley Allen $18,000. Those are the three payments out. The total of that would be 30, ah, 40 something.

ATTORNEY KACAVAS: 42.

JUSTICE DUGGAN: One other question. What other kinds of expenses associated with the redistricting process came out of these accounts besides legal fees, can you just characterize them in a general way?

REP. BURLING: Yes. All of the rest of the material in this list of debits from the account is very traditional redistricting stuff. The first two items, Caliper Corporation. We bought software for both sides. So, we paid Caliper Corporation both for the software application itself and the licenses to use it. And then, training, tuition because we sent House staffers to learn how to run the programs.

JUSTICE DUGGAN: That's the kind of software you use for the redistricting to figure out the votes.

REP. BURLING: That's exactly right, Your Honor. There are three items from my Chief of Staff Mr. Todd Quinn. He went to — this is a travel expense. He went to Newton, Mass to cover training. You'll see a large number here — these are just travel expenses. The House decided that it would put on a road show and it would take its redistricting plans to each of the counties. And, what you see are reimbursements of staffers and reps. from both sides of the aisle going to these various items. But, but these expenditures are all in the nature of $30, $20, $40 for mileage.

CHIEF JUSTICE BROCK: Approximately, how much was expended for consulting and software?

REP. BURLING: Well Caliper was nearly $8,000, travel expenses look like a couple of thousand maximum. We started with $45,000 — that was the appropriation we passed for ourselves to do this. We had $22,000 left by the time we got to paying legal fees for the majority party. The other thing I would just, if I may Your Honor since you asked the question. In summary, the Senate has available to it as of today approximately $1,976,000. The House has available to it $3,601,000 and the Joint House and Senate have available to them $1,125,000. But again, since we have a joint item for consultants with more than $200,000 in the account, it seems to me we have plenty of funds available. Thank you, Your Honors.

CHIEF JUSTICE BROCK: Thank you.

ATTORNEY KACAVAS: Thank you, Your Honor. I would simply like to echo all of what Representative Burling said and just add a few additional comments. First of all, Your Honors, while I did have the privilege and the honor of representing petitioners Clifton Below, et. al., the Senate Democrats in this matter, I did have the misfortune of

representing the minority party and, therefore, I derive no financial benefit as opposing counsel did from this fiscal committee account.

CHIEF JUSTICE BROCK: Have you considered requesting fees?

ATTORNEY KACAVAS: I have not done that, Your Honor, because I truly believe that this is — this comes first to be quite honest with you. We've got to deal with this first and my fees have been put off 'til later and I'm just trying to represent my clients to the best of my ability and resolve this matter. What I would say to the court regarding payment is that we were forced to come to this court seeking declaratory and injunctive relief. In joining the opening of the filing period for Senate candidates and declaring that the existing Senate Districts were unconstitutional and in granting that relief this court was performing, unquestionably, a judicial function. But, I believe the court's role changed over the course — as this case developed over the course of time. This role — this court's role changed from one of a judicial role to a legislative role. We have from day one taken the position that the legislature constitutionally delegated to redistrict, abdicated its responsibility. Quite to the contrary, the respondents have taken the position that this is a judicial usurpation and that is quite clear at page 9 of their memorandum where they say, "It is difficult to imagine a more intrusive usurpation of legislative authority than a judicial branch expenditure of funds from an appropriation specifically made to the legislature for legislative purposes." But, that ignores the fact that this court was performing a legislative function, reluctantly albeit. In the case of *Connor v Finch* a 1977 Supreme Court case that was quoted throughout our pleadings in this case and throughout the oral argument, the United States Supreme Court observed that a court is left with the unwelcome obligation of performing in the legislature's stead when the legislature fails to enact constitutionally valid redistricting plan. This court acted in the New Hampshire Legislature's stead, therefore funds appropriated for legislative purposes are properly payable to this court to pay the costs incurred by this court for performing the legislative function. And that's all I would say unless the court has any further questions. Thank you.

CHIEF JUSTICE BROCK: Thank you.

ATTORNEY LEHMANN: My name's Richard Lehmann, I represent the New Hampshire Senate. Good morning. I guess the first thing I have to say is that I have to take issue with my friend Attorney Kacavas' characterization of the legislature abdicating its responsibility in this case. The legislature passed redistricting bills. Those redistricting bills were vetoed. The Governor has constitutional authority to veto that's fine but to

then to throw it back at the legislature and say that the legislature somehow failed to perform strikes me as unfair. The petitioners state that they did — they had no choice but to come to this court, that there was absolutely no choice whatsoever but to come here. I submit that's not exactly true, in fact, it's the petitioners in this case who forced the issue, excuse me, by failing to override the Governor's veto.

CHIEF JUSTICE BROCK: Well, is that completely accurate Mr. Lehmann? If nothing happened this session to redistrict so it never became law and so what existed was the old redistricting system, and I assume that's what you would have gone forward with or tried to go forward with, absent something passing this session of the legislature. And their Petition for Declaratory Judgment sought a ruling that the existing system was unconstitutional under both the Federal and State Constitutions. Isn't that true?

ATTY. LEHMANN: Yes and no, I guess I disagree with the proposition that somebody at any point really planned to go forward with the existing plan. It was, clear in 1982 from *Monier v Gallen* that this court was going to step into the breach if one existed and, because of that, there was never any real doubt as to the fact that redistricting would occur was only a question of how it would be done and I, by suggesting as I did earlier, that there are — there were three specific actions that caused there to be no redistricting plan adopted as law. One by the legislature passing law, one by the Governor vetoing it, and one by the minority party failing to override the veto. I don't quarrel with anybody's decision that they made in that regard.

CHIEF JUSTICE BROCK: How would the election have gone forward absent something that the Governor, the House and the Senate agreed upon?

ATTORNEY LEHMANN: I don't think it would have, I think there would have been a judicially-created redistricting plan. Frankly and I don't, this is not a derogatory statement that I'm making about the court or anybody else but I think that had it not been clear that the court would step in, the likelihood of there being agreement would have been greater. Because

CHIEF JUSTICE BROCK: It's not your — it's not your position that it was judicial usurpation of legislative responsibility for this court to...

ATTORNEY LEHMANN: To formulate a redistricting plan?

CHIEF JUSTICE BROCK: Yes.

ATTORNEY LEHMANN: No, my the my — language about usurpation of legislative function at this point in the proceeding has to do with the appropriation authority and the prospect of the court ordering the legislature to appropriate funds to the court.

CHIEF JUSTICE BROCK: Would you agree that we were performing a legislative function?

ATTORNEY LEHMANN: No, I believe you were performing a judicial function, it was the fact that it was a judicial function that created jurisdiction in the first place. If it were truly a legislative function then it would have been performed in a legislative function. Now I do think that this is probably one of those areas that have been discussed in the court's opinion in which there is overlap. But I don't think that every time that there's going to be overlap in the functions of the branches of Government that those branches should then be looking to each other for payment for associated costs. The Executive Branch performs judicial functions every day at administrative hearings. But, I think it would be inappropriate for them to look at the court for funding because they're performing judicial function. I think that that overlap is part of what's anticipated by the constitution, the constitution itself contains some very literary, well thought, language concerning the ties that bind the three branches of government together. But, I do think it's inappropriate for the court to issue an order compelling the legislature to appropriate, effectively appropriate money to the court.

JUSTICE NADEAU: Mr. Lehmann, I have a observation and a question. I've been a full-time judge since 1981, the Superior Court and the Supreme Court. Prior to that, I was 13 years as a District Court Judge, part-time. In all that time, this is the most disappointing hearing at which I have ever been present. The question I have for you is this. There is no question that at least you admit this was a judicial function, you concede it was a judicial function. Your argument seems to be that there is judicial money and that there is legislative money. And that the judiciary shouldn't order the legislative money to be spent. It seems to me what we are talking about is the people's money. Everybody knows this bill was properly incurred, everybody knows this bill is going to be paid, everybody knows this bill is going to be paid by the people's money. The question I have for you is, what is the purpose that is being served here by the refusal to pay the people's bill, by the people's money in a way that doesn't bring two branches of government, the leaders of which are either here today or represented by counsel into a conflict which shouldn't be necessary. Could you answer that question for me please?

ATTORNEY LEHMANN: The reason it's necessary, I submit, is that is the same reason that its been necessary for the court to protect its own prerogatives and rights relative to separation of powers. The proposition advanced by the notion that the court would order the legislature to pay funds to the court in this instance strikes at the very core of the legislative function, which —

JUSTICE NADEAU: What you — you and the leaders know that the one thing the court does not want to do is to order the legislature to pay the funds, you know that. You also know that the funds — the bill is going to be paid and is going to be paid by the people's money. If your suggestion is that somehow the court spent money that it doesn't have or money that is being spent to serve the people in the court system, if that's your proposal and the proposal is that then the court somehow go back to the legislature to seek reimbursement, then what you're saying is that its possible for the legislature to refuse reimbursement and somehow that the people's money that should be spent on the people's obligation won't be spent. And, why does this have to be a conflict? Why does this have to be a confrontation? Why does this have to be a turf battle, when the money is there, the money was spent for the people, it saved the towns and cities from having to have another election and everybody was doing the people's work? Doesn't it make sense for there to be a way to do this without people having to urge each other to the limit?

ATTORNEY LEHMANN: I guess I would answer that in two parts. In the first part, I can't agree more that this is the people's money. But, in the constitutional scheme of things it's the legislature, the branch of government that is in fact closest to the people that's responsible for appropriating funds and has the tightest control over those appropriations. And the second part, I don't know what the current state of the court's budget is, but my understanding from the Legislative Budget Assistant is that in the last four fiscal years the court has allowed to lapse over a half of million dollars in each of those years. So, I don't mean any disrespect to the court when I say perhaps the question should be turned around. If the money is otherwise going to lapse back to the legislature why is it necessary for the judicial branch —

JUSTICE NADEAU: Well, let me tell you a little about that, Mr. Lehmann. The court is keeping now vacant 52 positions that are supposed to be there to serve the people. They haven't filled something like 49 or 50 new positions. Judge Kelly has cut 10% of the money to be used for per diem judges so that people in the District Courts can get quicker hearings there. The court also, the Probate Court, has cut funds for per diem judges

in the Probate Court. We have kept vacant 1 ½ Marital Master's positions, positions which are serving people in serious domestic relation cases. The Superior Court has cut jury trials for two counties. We have laid off 66 part-time security people. We've taken reduction from equipment lines. The point is not where and who has the most money. My concern is that this is a legitimate bill and it's a bill that should be paid by the people's funds and it shouldn't cost the people in other services to pay those funds. And, it would seem to me that there would be the same ease to pay this bill as there was to pay legal expenses without question, legal fees and expenses without question for one side, for a side that was urging us to keep in place an unconstitutional law. I don't understand why the confrontation is necessary. It's very troubling to see that it is necessary.

JUSTICE DALIANIS: Relative to the lapse, Mr. Lehmann, it sounds like a lot of money. But, when you look at the budget figures and you consider that it's spread over many different lines and we weren't allowed to over spend those lines so we had to under spend them and in the end that meant that there was a little money in a number of lines to turn back and it all added up to half a million dollars. It does not — it's not an easy answer to our budget problems and I don't expect you to be particularly sympathetic to them. The problem is, that I agree with Justice Nadeau, the last thing the court is interested in doing is ordering the legislature around. We've never wanted to do that, we tried to stay out of redistricting. We had to incur this expense. We incurred it, and in order to get it paid from our funds, we have to go to the legislature and get permission to take it out of a line that is otherwise already used up. So, I gather that the position of the Senate, at least, is we could pay it, we don't want to pay it and we think that that's fair. Is that kind of the bottom line?

ATTORNEY LEHMANN: I don't think that exactly summarizes the Senate's position.

JUSTICE DALIANIS: No?

ATTORNEY LEHMANN: I think it's true that the Senate could pay it. I think that I'm not in a position to comment upon whether or not the Senate would vote to pay it, if there was a request for a supplemental appropriation. Obviously, I don't get a vote in those things so I can't comment about that.

JUSTICE DALIANIS: Was there any problem in getting the lawyer's fees paid? Did the Senate have to vote on paying outside counsel?

ATTORNEY LEHMANN: I don't believe so.

JUSTICE DALIANIS: Okay.

ATTORNEY LEHMAN: I guess I don't understand exactly the relationship of the legal fees to the question before the court and I didn't come prepared to address the question.

JUSTICE DALIANIS: You don't see that as a redistricting expense?

ATTORNEY LEHMANN: The question is whether it's a legislative expense. And, I don't know that it's a legislative expense for people to come to court. The people came to court happened to be senators and representatives, but there's no need for that to be the case. Any voter in the State would have had standing to bring the matter before the court. So, wha — the extent to which the lawyers agreed to represent them incurred attorney's fees doing that is anybody's guess. I don't think that the appropriation to the legislature for legislative purposes authorizes the administrative actors within the legislature to pay court — to pay costs incurred by the expense. Costs incurred by the court, excuse me. Justice Nadeau made a — effectively, a very strong argument in favor of what the court's budget should be. But again, that is a question for the entire legislature to take up.

CHIEF JUSTICE BROCK: Let me ask, I have two or three questions. Let's assume that this process had cost us — there had been more time involved, rather than the urgency with which we addressed it — and it cost the judicial branch three million dollars and it was all legitimate expense necessary to redistricting, other State's that would certainly be a reasonable figure. Is it your position that the court would have to defer considering redistricting a State until the legislature appropriated three million dollars for it to do so?

ATTORNEY LEHMANN: No, my understanding of the way the process is designed to work is that the court approaches the legislature with an appropriation request necessary to perform all judicial functions for the biennium. The legislature may or may not appropriate what you think is necessary, but the court's responsibility is to do the best it can within the limit. And, the court has to prioritize whether it thinks that redistricting is sufficiently important to go — to go to the front of the money list and I submit that if you made the decision that it was you'd be making the right decision.

JUSTICE NADEAU: So, if the Superior Court has a capital murder trial and the legislature is not in session and they have to spend five times what is expected for a trial, they can't do that without legis — until they get the money from the legislature?

ATTORNEY LEHMANN: I think that the Superior Court should be prepared to handle all the things that the law permits to be brought before it, including a capital murder trial.

JUSTICE DUGGAN: So you're saying —

JUSTICE NADEAU: I hope you'll appear and support us the next time there is a budget, that there should be some kind of contingency fund added to the court system budget to provide for all contingencies.

ATTORNEY LEHMANN: I think that would be very appropriate thing for the judic —

JUSTICE NADEAU: Why don't you give me your address (laughter in the court) and I'll put you on the list of people to appear.

CHIEF JUSTICE BROCK: So, you're representing both the House and the Senate arguing here this morning?

ATTORNEY LEHMANN: Formally, it's my understanding, that the arguments are broken into two parts. I think it might make sense to bring everyone before the court — the arguments are the same on both sides —

CHIEF JUSTICE BROCK: I don't understand what you're telling me. We anticipated that somebody would be here to represent the House and the Speaker.

ATTORNEY LEHMANN: They're here.

CHIEF JUSTICE BROCK: Are they here to —

ATTORNEY LEHMANN: It's my understanding that they're here prep —

CHIEF JUSTICE BROCK: — participate in oral argument?

ATTORNEY LEHMAN: — yes. When we came in this morning Justice Brock, Clerk Fox informed us that we would be going one after the other, not all at the same time.

CHIEF JUSTICE BROCK: Oh, I see, okay I'm sorry. Before we let you go, do I understand that it's, at least the Senate's position, that the judicial branch has authority to spend money from its appropriation to pay this bill?

ATTORNEY LEHMANN: Yes.

CHIEF JUSTICE BROCK: And, one further question, just so there's no doubt. The money is available in these accounts that have been referred to. But, the House and the Senate for reasons of their own have decided not to appropriate funds for this purpose.

ATTORNEY LEHMANN: Appropriate —

CHIEF JUSTICE BROCK: Allocate funds.

ATTORNEY LEHMANN: — to pay the — not to — um' yes.

JUSTICE NADEAU: Well, excuse me. It's not exactly the House and the Senate, it's the members of the Joint Committee, isn't that right? The members of the Joint Committee have authority to spend funds from that committee for what they might consider to be redistricting expenses. Is that correct?

ATTORNEY LEHMANN: Legislative purposes.

JUSTICE NADEAU: Well, okay. But, they have the authority if they're persuaded that this was a legitimate expense for redistricting. It's not the Senate and not the legislature. It's not the 400 legislators and the 24 senators, it's the members of this Joint Committee.

ATTORNEY LEHMANN: There are funds that are available at the discretion of those committee — of those —

JUSTICE NADEAU: Do you know, are you able to tell us on the record or has Mr. Burling provided us with the names and titles who serve on the Joint Committee?

ATTORNEY LEHMANN: That's a matter of public record. I don't have the —

CHIEF JUSTICE BROCK: Thank you, Mr. Lehmann.

ATTORNEY DOUGLAS: It think the House is ready, Your Honor. I don't have a separate argument.

CHIEF JUSTICE BROCK: Alright. Thank you. I must confess that we're not clear what the order of presentation was going to be in the House case. But, I will assume it will be, the petitioners who will go first unless you've agreed otherwise. Mr. Hatem.

ATTORNEY HATEM: May it please the court, Your Honor. My name is Michael Hatem, I represent Peter Burling and the Democrats in this matter. I don't want to reinvent the wheel, and I completely concur with the arguments brought forth by Mr. Burling and Attorney Kacavas this morning. I would simply like to add, that I believe we all can agree that we

got here, with the previous briefs because the court was acting — providing a jud. — legislative function. Redistricting is clearly a legislative function. The court cases cited in our earlier briefs and our original petition all stated that if the court was going to step into this matter, it was going to be providing a legislative function. Ultimately, the court had to provide that function. This court redistricted the State of New Hampshire because the legislature was unable to. The reason it was unable to, was because there was a gubernatorial veto. It's irrelevant how — why the legislature failed to provide a redistricted law. The fact is, the legislature did fail and the court had to act legislatively. We believe the court has authority to award — or to have the legislature pay Mr. Bowers' fees from the *Claremont III* decision, 144 N.H. 590. In that case, this court stated, "To award attorney's fees in such a suit to a plaintiff who has succeeded in establishing a cause of action is not to saddle the unsuccessful party with the expense, but to pose — impose them on the class that has benefited from them and that would have had to pay them had it brought the suit." Fairly, Mr. Bowers' fees aren't attorney's fees. But, the rational behind *Claremont III* applies. The citizens of the State of New Hampshire benefited from having a constitutional redistricting plan. Had the legislature done it, it would have had to impose — had to have paid those costs. This is the people's money. There was — it is an important constitutional right. Clearly, no constitutional right is more important than the right to vote. And, Mr. Bowers was acting as an advocate for the State of — Citizens of the State of New Hampshire in imposing a constitutional plan for redistricting the State. A plan the legislature was incapable of proposing. And, therefore, the court acting, as the legislature, imposed the costs. These are legislative costs. As you have heard this morning from both sides, there is money in the Joint Fiscal Committee to pay these costs. My understanding is the committee can be called — called back into session at the call of the Chair and this vote can occur in short order. The whole entire Senate and House does not have to come back into session. Therefore, we believe that this is a proper cost for the legislature and we believe its supported by *Claremont III* as well as a previous case, as Attorney Kacavas noted, *Finch v. Conner* and that's all I have.

CHIEF JUSTICE BROCK: Thank you.

ATTORNEY HATEM: Thank you.

ATTORNEY MILLER: Good morning. May it please the court, I am Betsy Miller and I represent the House of Representatives. This is a difficult place to be right now. We feel the same way you do about this and setting up this kind of confrontation is really not good for either branch. But, I guess I want to answer some of your questions again about some of

the details about how the legislative budget functions, how these two committees, the Fiscal Committee and the Facilities Committee, function because I think there's some misunderstanding about how spending occurs in — out of the legislative budget. The Legislative Fiscal Committee did not approve payment of the legal fees. They have no jurisdiction whatsoever over the legislative budget. The Legislative Facilities Committee, which is made up basically of leadership of the Senate and the House and of both parties has jurisdiction over the legislative budget. They make personnel decisions, they do raise decisions, hiring decisions. The Speaker and the President have authority to spend out of the lines that have been established in the legislative budget, which, as your budget does, goes through the whole budget process from the House Finance Committee to the Senate Finance Committee and to both bodies. And, it's set so that appropriations are itemized by line and the Speaker and the President can make — can spend out of lines that are specifically appropriated for legislative purposes.

CHIEF JUSTICE BROCK: May I ask you a question Ms. Miller. We've been told that the Senate has $1,976,000 remaining, the House $3,601,000. Is it true or not that, with respect to those funds, it doesn't require action by the Joint Facilities Committee that each body of the House can decide, or the leadership of each body of the House can decide how that money's spent?

ATTORNEY MILLER: That is true.

JUSTICE DALIANIS: And, they don't want to spend it on this bill. I take it that's your bottom line.

ATTORNEY MILLER: The position of the House, as I am here to present it today, is that the expenses of Bobby Bowers were not a legislative expense. We continue to believe that that was a judicial expense in all its characteristics.

JUSTICE DALIANIS: And notwithstanding that belief, and though there might be differences of opinion about it, they aren't even willing to pay the bill in the spirit of good will. We don't have the money. You folks apparently do. And I'm just trying to figure out why the House and Senate leadership think this is fair.

ATTORNEY MILLER: I don't think it's a question of whether we have the money or you have the money. If it was a $2000 bill, I think that we'd be in the same position we're in now.

JUSTICE DALIANIS: And, you think that's fair?

ATTORNEY MILLER: I can't answer whether I think that's fair or not. I think that what the House is doing is saying, they've determined it's not a legislative expense.

CHIEF JUSTICE BROCK: Do you agree that it's a legal issue as to whether this is a legislative expense or a judicial expense?

ATTORNEY MILLER: I think it's more of a factual issue, actually. I think in the way that the court handled the hiring and the utilization of the technical advisor.

CHIEF JUSTICE BROCK: But, it's a decision for the court to make ultimately.

ATTORNEY MILLER: You're ultimately here to make that decision today.

CHIEF JUSTICE BROCK: And, if this court were to make the decision that this was a legitimate judicial expense or legislative expense, whichever we determine, I assume that your recommendation to your clients would be that they recognize that decision.

ATTORNEY MILLER: I think my recommendation to my client would be confidential. I would follow all ethical guidelines that I'm subject to and —

JUSTICE NADEAU: Can I ask you a question, and this is not something that I've discussed with my colleagues: But, if we were to say that we're not going to issue an order in this case for two weeks or 30 days to give you the opportunity to take the tapes of this argument to whoever's in charge, whether it's the leadership or whether it's the Joint Committee, so that they can hear the arguments here, the questions here first hand, so that they can assess the depth with which we are trying to avoid this confrontation. So, that they can decide whether as a matter of comity or whether as a matter of decision making, after hearing those tapes and after hearing what was said by everybody here, that they might either reconsider or decide that to pay the people's bill with the people's money is the right thing to do for the people, for the government and for the branches of government. Is that something that you would recommend and would be willing to do?

ATTORNEY MILLER: I would certainly be willing to do that.

JUSTICE NADEAU: Alright, thank you.

JUSTICE DUGGAN: If Mr. Bowers remains unpaid for a period of time and sues and obtains a judgment on the amount that he is owed with interest, I assume, the State would pay the judgment.

ATTORNEY MILLER: I assume that would occur.

JUSTICE DUGGAN: How would you pay it?

ATTORNEY MILLER: I think, probably, the Attorney General would be handling that one. So, I can't really answer that.

JUSTICE DUGGAN: But, there's no doubt that you'd pay the judgment?

ATTORNEY MILLER: I believe the judgment would have to be paid.

CHIEF JUSTICE BROCK: With attorney's fees and interest.

ATTORNEY MILLER: Probably.

CHIEF JUSTICE BROCK: Well, I interrupted you and it's turned into a lengthy interruption with questions. But, if you want to complete your remarks, we'd appreciate it.

ATTORNEY MILLER: I just have one more concern that I want to express on behalf of the House and perhaps it's why the House is so adamant in characterizing the technical advisors expenses as a judicial expense. And that is, that we believe that redistricting is a very public matter and we did have some concern at the time that the — everything that's surrounding Bobby Bowers was done in-camera and confidentially, as you have the right to do. But, there was some concern and I think it was expressed even by the petitioners at one point, that before an order — a redistricting order — plan became final, that the parties would have an opportunity to have some input in that. And, so that that would make it a more public matter. And, as you know, the House is subject to the right-to-know law, we do everything in public and that's a concern of the characterization of the expenses of the technical advisor and how he — and how you worked with him.

JUSTICE NADEAU: Of course, the Secretary of State and all the town selectman were screaming bloody murder that if we didn't hurry up and get this decision out they'd have to have two elections, they'd have to spend millions of dollars and that certainly was some consideration.

ATTORNEY MILLER: But, conceivably, as other courts do — take up redistricting, there are instances in which the fact-finding is done in public. The parties had experts, we had people familiar with the software and

familiar with the numbers, all sides did that could have come before you and created plans that you wanted them to create.

CHIEF JUSTICE BROCK: Did the House object at the time to the appointment of Mr. Bowers?

ATTORNEY MILLER: No, absolutely not. But, because the court is — can — you have the inherent authority to appoint such a technical advisor.

CHIEF JUSTICE BROCK: You had an opportunity to object to his appointment, but you didn't.

ATTORNEY MILLER: That's right. But, we're now objecting to — we — we still don't object to your inherent authority to have a technical advisor as a judicial expense. That — we don't object to that.

JUSTICE DALIANIS: Relative to the public nature of the fact finding counsel, I think that no group more than the court would have been happy to have more time —

ATTORNEY MILLER: Yes, ma'am.

JUSTICE DALIANIS: — so that such a process could have played out publicly. But, if — I'm sure you do recall, we were left with a window of about this wide to deal with the problem and felt there was no other way to approach it.

ATTORNEY MILLER: Yes, I understand.

CHIEF JUSTICE BROCK: Finally, I wanted to ask a question I asked of the Senate. Is it the position of the House that this court usurped legislative responsibilities when it engaged in the redistricting process.

ATTORNEY MILLER: Absolutely not. Thank you.

CHIEF JUSTICE BROCK: Is there anything further? If not, the matter —

JUSTICE DALIANIS: Mr. Carter.

ATTORNEY CARTER: I have nothing further to add.

CHIEF JUSTICE BROCK: Okay, sorry I didn't mean to overlook you. We'll be in recess. Thank you.

### Order dated December 31, 2002

The court having been notified by the Attorney General that the State has agreed to pay the technical advisor's bill for services, there is no need for a further order. These cases are closed.

Brock, C.J., and Nadeau, Dalianis, and Duggan, JJ., concurred.